# MIDDLESEX COUNTY SEWERAGE AUTHORITY ET AL. v. NATIONAL SEA CLAMMERS ASSOCIATION ET AL.

No. 79–1711.  Argued February 24, 1981—Decided June 25, 1981*

*Together with No. 79–1754, *Joint Meeting of Essex and Union Counties* v. *National Sea Clammers Association et al.;* No. 79–1760, *City of New York et al.* v. *National Sea Clammers Association et al;* and No. 80–12, *Environmental Protection Agency et al.* v. *National Sea Clammers Association et al.,* also on certiorari to the same court.

1

2

PoWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, and REHNQUIST, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment in part and dissenting in part, in which BLACKMUN, J., joined, *post*, p. 22.

*Milton B. Conford* argued the cause for petitioners in Nos. 79–1711, 79–1754, and 79–1760. With him on the brief for petitioners Middlesex County Sewerage Authority et al. in No. 79–1711 were *Marvin J. Brauth* and *Stephen J. Moses. Charles C. Carella* and *Jeffrey L. Miller* filed a brief for petitioners Passaic Valley Sewerage Authority et al. in No. 79–1711. *George J. Minish* filed a brief for petitioners in No. 79–1754. *Allen G. Schwartz, Leonard Koerner,* and *Stephen P. Kramer* filed briefs for petitioners in No. 79–1760.

*Alan I. Horowitz* argued the cause for petitioners in No. 80–12 and the federal respondents in Nos. 79–1711, 79–1754, 79–1760. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne, Raymond N. Zagone,* and *Jacques B. Gelin.*

*Robert P. Corbin* argued the cause for respondents National Sea Clammers Association et al. in all cases. With him on the brief were *Philip A. Ryan, Edward C. German,* and *Dean F. Murtagh.*

4

JUSTICE POWELL delivered the opinion of the Court.

In these cases, involving alleged damage to fishing grounds caused by discharges and ocean dumping of sewage and other waste, we are faced with questions concerning the availability of a damages remedy, based either on federal common law or on the provisions of two Acts—the Federal Water Pollution Control Act (FWPCA), 86 Stat. 816, as amended, 33 U. S. C. § 1251 *et seq.* (1976 ed. and Supp. III), and the Marine Protection, Research, and Sanctuaries Act of 1972 (MPRSA), 86 Stat. 1052, as amended, 33 U. S. C. § 1401 *et seq.* (1976 ed. and Supp. III).

I

Respondents are an organization whose members harvest fish and shellfish off the coast of New York and New Jersey, and one individual member of that organization. In 1977, they brought suit in the United States District Court for the District of New Jersey against petitioners—various governmental entities and officials from New York,[1] New Jersey,[2] and the Federal Government.[3] Their complaint alleged that sewage, sewage "sludge," and other waste materials were being discharged into New York Harbor and the Hudson

---

[1] The New York defendants were the New York Department of Environmental Conservation; Ogden R. Reid, individually and as Commissioner of that Department; the City of New York; Abraham Beame, Mayor of New York City; the West Long Beach Sewer District; the County of Westchester Department of Environmental Facilities; the city of Long Beach; and the city of Glen Cove.

[2] The New Jersey defendants were the New Jersey Department of Environmental Protection; David J. Bardin, individually and as Commissioner of that Department; the Bergen County Sewer Authority; the Joint Meeting of Essex and Union Counties; the Passaic Valley Sewerage Commissioners; the Middlesex County Sewerage Authority; the Linden-Roselle Sewerage Authority; and the Middletown Sewerage Authority.

[3] The federal defendants were the Environmental Protection Agency; Russell E. Train, individually and as EPA Administrator; the Army Corps of Engineers; and Martin R. Hoffman, individually and as Secretary of the Army.

River by some of the petitioners. In addition it complained of the dumping of such materials directly into the ocean from maritime vessels. The complaint alleged that, as a result of these activities, the Atlantic Ocean was becoming polluted, and it made special reference to a massive growth of algae said to have appeared offshore in 1976.[4] It then stated that this pollution was causing the "collapse of the fishing, clamming and lobster industries which operate in the waters of the Atlantic Ocean."[5]

Invoking a wide variety of legal theories,[6] respondents sought injunctive and declaratory relief, $250 million in compensatory damages, and $250 million in punitive damages. The District Court granted summary judgment to petitioners[7] on all counts of the complaint.[8]

---

[4] The complaint alleged that this growth of algae was caused by the discharges of sewage and "covered an area of the Atlantic Ocean ranging from approximately the southwest portion of Long Island, New York to a point approximately due east of Cape May, New Jersey, and extending from a few miles offshore to more than 20 miles out to sea," Complaint ¶ 35, App. 25a. Respondents' brief in this Court states that when

"this massive algal·bloom died, its residuals settled on the ocean floor, creating a condition of anoxia, or oxygen deficiency, in and about the water near the ocean's floor. This condition resulted in the death and destruction of an enormous amount of marine life, particularly with respect to the shellfish and other ocean-bottom dwellers and other marine life unable to escape the blighted area." Brief for Respondents 4.

[5] Complaint ¶ 39, App. 26a.

[6] Respondents based claims on the FWPCA; the MPRSA; federal common law; § 13 of the Rivers and Harbors Appropriation Act of 1899, 33 U. S. C. § 407; the National Environmental Policy Act of 1969, 42 U. S. C. § 4321 *et seq.;* New York and New Jersey environmental statutes; the Fifth, Ninth, and Fourteenth Amendments to the United States Constitution; 46 U. S. C. § 740; the Federal Tort Claims Act, 28 U. S. C. §§ 1346 (b), 2671 *et seq.;* and state tort law.

[7] The court previously had dismissed claims against the New York and New Jersey environmental protection agencies and their directors. These defendants are not among the petitioners in this Court.

[8] The court's judgment with respect to the pendent state-law claims was without prejudice.

In holdings relevant here, the District Court rejected respondents' nuisance claim under federal common law, see *Illinois* v. *Milwaukee,* 406 U. S. 91 (1972), on the ground that such a cause of action is not available to private parties. With respect to the claims based on alleged violations of the FWPCA, the court noted that respondents had failed to comply with the 60-day notice requirement of the "citizen suit" provision in § 505 (b)(1)(A) of the Act, 86 Stat. 888, 33 U. S. C. § 1365 (b)(1)(A). This provision allows suits under the Act by private citizens, but authorizes only prospective relief, and the citizen plaintiffs first must give notice to the EPA, the State, and any alleged violator. *Ibid.*[9] Be-

---

[9] Section 505, as set forth in 33 U. S. C. §1365, provides, in part:

"(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

"(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

"(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

"The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319 (d) of this title.

"(b) No action may be commenced—

"(1) under subsection (a)(1) of this section—

"(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

"(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States,

cause respondents did not give the requisite notice, the court refused to allow them to proceed with a claim under the Act independent of the citizen-suit provision and based on the general jurisdictional grant in 28 U. S. C. § 1331.[10] The court applied the same analysis to respondents' claims under the MPRSA, which contains similar citizen-suit and notice provisions. 33 U. S. C. § 1415 (g).[11] Finally, the court rejected a

---

or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

"(2) under subsection (a) (2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317 (a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation."

The Administrator may intervene in any citizen suit. § 505 (c) (2), 33 U. S. C. § 1365 (c) (2).

See n. 27, *infra* (legislative history emphasizing the limited forms of relief available under the Act).

In this opinion we refer to sections of the original FWPCA, added in the 1972 Amendments, with parallel citations to the United States Code.

[10] In so holding the court rejected an argument that the notice requirement is inapplicable because of the "saving clause" in § 505 (e), which states:

"Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)." 33 U. S. C. § 1365 (e).

[11] The citizen-suit provision in the MPRSA provides in part:

"(g) (1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any prohibition, limitation, criterion, or permit established or issued by or under this subchapter. . The district courts shall have jurisdiction, without regard to the

possible claim of maritime tort, both because respondents had failed to plead such claim explicitly and because they had failed to comply with the procedural requirements of the federal and state Tort Claims Acts.[12]

The United States Court of Appeals for the Third Circuit reversed as to the claims based on the FWPCA, the MPRSA, the federal common law of nuisance, and maritime tort. *Na-*

---

amount in controversy or the citizenship of the parties, to enforce such prohibition, limitation, criterion, or permit, as the case may be.

"(2) No action may be commenced—

"(A) prior to sixty days after notice of the violation has been given to the Administrator or to the Secretary, and to any alleged violator of the prohibition, limitation, criterion, or permit; or

"(B) if the Attorney General has commenced and is diligently prosecuting a civil action in a court of the United States to require compliance with the prohibition, limitation, criterion, or permit; or

"(C) if the Administrator has commenced action to impose a penalty pursuant to subsection (a) of this section, or if the Administrator, or the Secretary, has initiated permit revocation or suspension proceedings under subsection (f) of this section; or

"(D) if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of this subchapter." 33 U. S. C. §§ 1415 (g) (1), (2).

The United States may intervene in any citizen suit brought under the Act. 33 U. S. C. § 1415 (g) (3) (B).

Like the FWPCA, the MPRSA contains a "saving clause," which states:

"The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Administrator, the Secretary, or a State agency)." § 1415 (g) (5).

[12] See 28 U. S. C. §§ 1346 (b), 2671 *et seq.;* N. Y. Gen. Mun. Law §§ 50–e, 50–i (McKinney 1977 and Supp. 1980–1981); N. J. Stat. Ann. § 59:1–1 *et seq.* (West Supp. 1981–1982). The District Court noted that respondents had given timely notice to one defendant—New York City.

The petitions for certiorari in this Court raised questions concerning the applicability of state Tort Claims Acts and the Eleventh Amendment to tort suits in federal court. These questions are not, however, within the scope of the questions on which review was granted.

*tional Sea Clammers Assn.* v. *City of New York,* 616 F. 2d 1222 (1980). With respect to the FWPCA, the court held that failure to comply with the 60-day notice provision in § 505 (b)(1)(A), 33 U. S. C. § 1365 (b)(1)(A), does not preclude suits under the Act in addition to the specific "citizen suits" authorized in § 505. It based this conclusion on the saving clause in § 505 (e), 33 U. S. C. § 1365 (e), preserving "any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief." 616 F. 2d, at 1226–1228; see n. 10, *supra.* The Court of Appeals then went on to apply our precedents in the area of implied statutory rights of action,[13] and concluded that "Congress intended to permit the federal courts to entertain a private cause of action implied from the terms of the [FWPCA], preserved by the savings clause of the Act, on behalf of individuals or groups of individuals who have been or will be injured by pollution in violation of its terms." 616 F. 2d, at 1230–1231.

The court then applied this same analysis to the MPRSA, concluding again that the District Court had erred in dismissing respondents' claims under this Act. Although the court was not explicit on this question, it apparently concluded that suits for *damages,* as well as for injunctive relief, could be brought under the FWPCA and the MPRSA.[14]

---

[13] *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11 (1979); *Touche Ross & Co.* v. *Redington,* 442 U. S. 560 (1979); *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979); *Cort* v. *Ash,* 422 U. S. 66 (1975).

[14] After holding that there is an implied right of action under the FWPCA, the court stated:

"Having so held, we reject the federal government defendants' sovereign immunity argument. The 1976 amendments to section 1331 of title 28 make clear that sovereign immunity has been waived in all suits by plaintiffs seeking injunctive relief against federal agencies or officers. Whether damages can be recovered from the federal government is a separate

With respect to the federal common-law nuisance claims, the Court of Appeals rejected the District Court's conclusion that private parties may not bring such claims. It also held, applying common-law principles, that respondents "alleged sufficient individual damage to permit them to recover damages for this essentially public nuisance." *Id.*, at 1234. It thus went considerably beyond *Illinois* v. *Milwaukee*, 406 U. S. 91 (1972), which involved purely prospective relief sought by a state plaintiff.[15]

Petitions for a writ of certiorari raising a variety of arguments were filed in this Court by a group of New Jersey sewerage authorities (No. 79–1711), by the Joint Meeting of Essex and Union Counties in New Jersey (No. 79–1754), by the City and Mayor of New York (No. 79–1760), and by all of the federal defendants named in this suit (No. 80–12).[16] We granted these petitions, limiting review to three questions: (i) whether FWPCA and MPRSA imply a private

question to which the Federal Tort Claims Act speaks." 616 F. 2d, at 1231 (footnote omitted).

This passage suggests that, as a general matter, the court had concluded that the statutory rights of action it was recognizing included damages relief. An additional indication is the fact that, by the time of the Court of Appeals decision, any relief other than damages could not have been too important to respondents. The algal bloom about which respondents complain died in 1976. The Court of Appeals decision was not handed down until 1980. Under the MPRSA, 33 U. S. C. § 1412a (a) (1976 ed., Supp. III), the EPA is required to end all ocean dumping of sewage sludge by December 31, 1981.

[15] The court also held that respondents had offered allegations sufficient to make out a claim of maritime tort, cognizable under admiralty jurisdiction. 616 F. 2d, at 1236. It did not decide whether the Federal Tort Claims Act, with its various procedural requirements, 28 U. S. C. §§ 1346 (b), 2671 *et seq.*, applies to any of respondents' federal-law claims against federal defendants, 616 F. 2d, at 1237, although it did hold that the Act precluded a "money damage recovery against federal agencies based on state law," *id.*, at 1236.

[16] See n. 3, *supra*. Petitioners in Nos. 79–1711, 79–1754, and 80–12 also named the remaining petitioners as respondents, based on cross-claims filed in the District Court.

right of action independent of their citizen-suit provisions, (ii) whether all federal common-law nuisance actions concerning ocean pollution now are pre-empted by the legislative scheme contained in the FWPCA and the MPRSA, and (iii) if not, whether a private citizen has standing to sue for damages under the federal common law of nuisance. We hold that there is no implied right of action under these statutes and that the federal common law of nuisance has been fully pre-empted in the area of ocean pollution.[17]

## II

The Federal Water Pollution Control Act was first enacted in 1948. Act of June 30, 1948, 62 Stat. 1155. It emphasized state enforcement of water quality standards. When this legislation proved ineffective, Congress passed the Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92–500, 86 Stat. 816, 33 U. S. C. § 1251 *et seq.* The Amendments shifted the emphasis to "direct restrictions on discharges," *EPA* v. *California ex rel. State Water Resources Control Board,* 426 U. S. 200, 204 (1976), and made it "unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms," *id.,* at 205.[18] While still allowing for state administration and enforcement under federally approved state plans, §§ 402 (b), (c), 33 U. S. C. §§ 1342 (b), (c), the Amendments created various federal minimum effluent standards, §§ 301–307, 33 U. S. C. §§ 1311–1317.

The Marine Protection, Research, and Sanctuaries Act of

---

[17] We therefore need not discuss the question whether the federal common law of nuisance could ever be the basis of a suit for damages by a private party.

[18] The Act applies to discharges of pollutants from any source into navigable waters, including the "territorial seas," 33 U. S. C. §§ 1362 (7), (12), and applies as well to discharges from sources "other than a vessel or other floating craft" into the "contiguous zone" and the high seas, §§ 1362 (9), (10), (12). See S. Rep. No. 92–414, p. 75 (1971).

1972, Pub. L. 92–532, 86 Stat. 1052, sought to create comprehensive federal regulation of the dumping of materials into ocean waters near the United States coastline. Section 101 (a) of the Act requires a permit for any dumping into ocean waters, when the material is transported from the United States or on an American vessel or aircraft. 33 U. S. C. § 1411 (a).[19] In addition, it requires a permit for the dumping of material transported from outside the United States into the territorial seas or in the zone extending 12 miles from the coastline, "to the extent that it may affect the territorial sea or the territory of the United States." § 1411 (b).

The exact nature of respondents' claims under these two Acts is not clear, but the claims appear to fall into two categories. The main contention is that the EPA and the Army Corps of Engineers have permitted the New Jersey and New York defendants to discharge and dump pollutants in amounts that are not permitted by the Acts. In addition, they seem to allege that the New York and New Jersey defendants have violated the terms of their permits. The question before us is whether respondents may raise either of these claims in a private suit for injunctive and monetary relief, where such a suit is not expressly authorized by either of these Acts.[20]

---

[19] These permits are issued by the Administrator of the Environmental Protection Agency, 33 U. S. C. § 1412, except in the case of dredged materials, which may be dumped under a permit issued by the Secretary of the Army, § 1413.

[20] The Court of Appeals did state that the saving clause in § 505 (e) of the FWPCA "provides an independent remedy for injured parties unburdened by the notice requirements of section 505 (b)." 616 F. 2d, at 1227. But the court did not conclude that the saving clause is itself an express authorization of private damages suits. Instead, it held that the saving clause acted to preserve any existing right to enforce the Act, in addition to the explicit, citizen-suit remedy in § 505 (b). The court went on to apply an implied-right-of-action analysis before concluding that a private suit for damages is among the pre-existing remedies preserved by the saving clause.

## A

It is unnecessary to discuss at length the principles set out in recent decisions concerning the recurring question whether Congress intended to create a private right of action under a federal statute without saying so explicitly.[21] The key to the inquiry is the intent of the Legislature. *Texas Industries, Inc.* v. *Radcliff Materials, Inc.,* 451 U. S. 630, 639 (1981); *California* v. *Sierra Club,* 451 U. S. 287, 293 (1981); *Universities Research Assn.* v. *Coutu,* 450 U. S. 754, 770 (1981); *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 15 (1979); *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 568 (1979). We look first, of course, to the statutory language, particularly to the provisions made therein for enforcement and relief. Then we review the legislative history and other traditional aids of statutory interpretation to determine congressional intent.

These Acts contain unusually elaborate enforcement provisions, conferring authority to sue for this purpose both on government officials and private citizens. The FWPCA, for example, authorizes the EPA Administrator to respond to violations of the Act with compliance orders and civil suits. § 309, 33 U. S. C. § 1319.[22] He may seek a civil penalty of up to $10,000 per day, § 309 (d), 33 U. S. C. § 1319 (d), and criminal penalties also are available, § 309 (c), 33 U. S. C. § 1319 (c). States desiring to administer their own permit programs must demonstrate that state officials possess adequate authority to abate violations through civil or criminal penalties or other means of enforcement. § 402 (b)(7), 33 U. S. C. § 1342 (b)(7). In addition, under § 509 (b), 33 U. S. C. § 1369 (b), "any interested person" may seek judicial

---

[21] In recent years, the question has arisen with increased frequency. See *Cannon* v. *University of Chicago,* 441 U. S., at 741–742 (POWELL, J., dissenting).

[22] The Administrator is authorized to give the States an opportunity to take action before doing so himself. 33 U. S. C. § 1319 (a)(1).

14

review in the United States courts of appeals of various particular actions by the Administrator, including establishment of effluent standards and issuance of permits for discharge of pollutants.[23] Where review could have been obtained under this provision, the action at issue may not be challenged in any subsequent civil or criminal proceeding for enforcement. § 1369 (b)(2).

These enforcement mechanisms, most of which have their counterpart under the MPRSA,[24] are supplemented by the express citizen-suit provisions in § 505 (a) of the FWPCA, 33 U. S. C. § 1365 (a), and § 105 (g) of the MPRSA, 33 U. S. C. § 1415 (g). See nn. 9, 11, *supra*. These citizen-suit provisions authorize private persons to sue for injunctions to enforce these statutes.[25] Plaintiffs invoking these provisions first must comply with specified procedures—which respondents here ignored—including in most cases 60 days' prior notice to potential defendants.

In view of these elaborate enforcement provisions it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under MPRSA and FWPCA. As we stated in *Transamerica Mortgage Advisors, supra*, "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary

---

[23] This review must be sought within 90 days. The review provisions of § 509 are open to "[a]ny person," S. Rep. No. 92–414, p. 85 (1971), and thus provide an additional procedure to "private attorneys general" seeking to enforce the Act, supplementing the citizen suits authorized in § 505. See W. Rodgers, Environmental Law 87–88 (1977).

[24] The MPRSA provides for assessment of civil penalties by the Administrator, 33 U. S. C. § 1415 (a), criminal penalties, § 1415 (b), suits for injunctive relief by the Attorney General, § 1415 (d), and permit suspensions or revocations, § 1415 (f).

[25] Under the FWPCA, civil penalties, payable to the Government, also may be ordered by the court. § 505 (a), 33 U. S. C. § 1365 (a).

of reading others into it." 444 U. S., at 19. See also *Touche Ross & Co.* v. *Redington, supra,* at 571–574. In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.

As noted above, the Court of Appeals avoided this inference. Discussing the FWPCA, it held that the existence of a citizen-suit provision in § 505 (a) does not rule out implied forms of private enforcement of the Act. It arrived at this conclusion by asserting that Congress intended in § 505 (a) to create a limited cause of action for "private attorneys general"—"non-injured member[s] of the public" suing to promote the general welfare rather than to redress an injury to their own welfare. 616 F. 2d, at 1227. It went on to conclude:

> "A private party who is *injured* by the alleged violation, as these plaintiffs allege they were, has an alternate basis for suit under section 505 (e), 33 U. S. C. § 1365 (e), and the general federal question jurisdiction of the Judicial Code, 28 U. S. C. § 1331 (1976). Section 505 (e) is a savings clause that preserves all rights to enforce the Act or seek relief against the Administrator. Coupled with the general federal question jurisdiction it permits this suit to be brought by these parties." *Ibid.* (footnotes omitted) (emphasis added).

There are at least three problems with this reasoning. First, the language of the saving clause on which the Court of Appeals relied, see n. 10, *supra,* is quite ambiguous concerning the intent of Congress to "preserve" remedies under the FWPCA itself. It merely states that nothing in the citizen-suit provision "shall restrict any right which any person . . . may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief." It is doubtful that the phrase "any stat-

ute" includes the very statute in which this statement was contained.[26]

Moreover, the reasoning on which the Court of Appeals relied is flawed for another reason. It draws a distinction between "non-injured" plaintiffs who may bring citizen suits to enforce provisions of these Acts, and the "injured" plaintiffs in this litigation who claim a right to sue under the Acts, not by virtue of the citizen-suit provisions, but rather under the language of the saving clauses. In fact, it is clear that the citizen-suit provisions apply only to persons who can claim some sort of injury and there is, therefore, no reason to infer the existence of a separate right of action for "injured" plaintiffs. "Citizen" is defined in the citizen-suit section of the FWPCA as "a person or persons having an interest which is or may be adversely affected." § 505 (g), 33 U. S. C. § 1365 (g). It is clear from the Senate Conference Report that this phrase was intended by Congress to allow suits by all persons possessing standing under this Court's decision in *Sierra Club* v. *Morton,* 405 U. S. 727 (1972). See S. Conf. Rep. No. 92–1236, p. 146 (1972). This broad cate-

---

[26] In fact the Senate Report on the FWPCA Amendments of 1972 stated with respect to the saving clause:

"It should be noted, however, that the section would specifically preserve any rights or remedies under any *other* law. Thus, if damages could be shown, other remedies would remain available. Compliance with requirements under this Act would not be a defense to a common law action for pollution damages." S. Rep. No. 92–414, p. 81 (1971) (emphasis added).

See also S. Rep. No. 92–451, pp. 23–24 (1971) (Report on the MPRSA) (the citizen-suit provision does not restrict or supersede "any other right to legal action which is afforded the potential litigant in any other statute or the common law").

It might be argued that the phrase "any effluent standard or limitation" in § 505 (e) necessarily is a reference to the terms of the FWPCA. We, however, are unpersuaded that Congress necessarily intended this meaning. The phrase also could refer to state statutory limitations, or to "effluent limitations" imposed as a result of court decrees under the common law of nuisance.

gory of potential plaintiffs necessarily includes both plaintiffs seeking to enforce these statutes as private attorneys general, whose injuries are "noneconomic" and probably noncompensable, and persons like respondents who assert that they have suffered tangible economic injuries because of statutory violations.

Finally, the Court of Appeals failed to take account of the rest of the enforcement scheme expressly provided by Congress—including the opportunity for "any interested person" to seek judicial review of a number of EPA actions within 90 days, § 509 (b), 33 U. S. C. § 1369 (b). See *supra,* at 13–14.

The Court of Appeals also applied its reasoning to the MPRSA. But here again we are persuaded that Congress evidenced no intent to authorize by implication private remedies under these Acts apart from the expressly authorized citizen suits. The relevant provisions in the MPRSA are in many respects almost identical to those of the FWPCA. 33 U. S. C. § 1415 (g). Although they do not expressly limit citizen suits to those who have suffered some injury from a violation of the Act, we are not persuaded by this fact alone that Congress affirmatively intended to imply the existence of a parallel private remedy, after setting out expressly the manner in which private citizens can seek to enjoin violations.

In *Cort* v. *Ash,* 422 U. S. 66, 78 (1975), the Court identified several factors that are relevant to the question of implied private remedies. These include the legislative history. See *ibid.* ("Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?"). This history does not lead to a contrary conclusion with respect to implied remedies under either Act. Indeed, the Report and debates provide affirmative support for the view that Congress intended the limitations imposed on citizen suits to apply to all private suits under these Acts.[27]

---

[27] The Senate Reports on both Acts placed particular emphasis on the limited nature of the citizen suits being authorized. S. Rep. No. 92–451,

18

Thus, both the structure of the Acts and their legislative history lead us to conclude that Congress intended that private remedies in addition to those expressly provided should not be implied.[28]  Where, as here, Congress has made clear that implied private actions are not contemplated, the courts are not authorized to ignore this legislative judgment.

at 23; S. Rep. No. 92–414, at 81.  In addition, the citizen-suit provision of the FWPCA was expressly modeled on the parallel provision of the Clean Air Act, 42 U. S. C. § 7604 (1976 ed., Supp. III).  See S. Rep. No. 92–414, at 79.  And the legislative history of the latter Act contains explicit indications that private enforcement suits were intended to be limited to the injunctive relief expressly provided for.  Senator Hart, for example, stated:

"It has been argued, however, that conferring additional rights on the citizen may burden the courts unduly.  I would argue that the citizen suit provision of S. 4358 has been carefully drafted to prevent this consequence from arising.  First of all, it should be noted that the bill makes no provision for damages to the individual.  It therefore provides no incentives to suit other than to protect the health and welfare of those suing and others similarly situated.  It will be the rare, rather than the ordinary, person, I suspect, who, with no hope of financial gain and the very real prospect of financial loss, will initiate court action under this bill."  116 Cong. Rec. 33104 (1970).

Similarly, during the debates on the Clean Air Act, Senator Muskie, in response to concerns expressed by other Senators, contrasted the citizen-suit provision with the terms of S. 3201, a consumer protection bill that would have authorized private suits for damages:

"Senate bill 3201 provides damages and a remedy for recovery of fines and restitution, and other monetary damages.  The pending bill is limited to seek [sic] abatement of violation of standards established administratively under the act, and expressly excludes damage actions."  *Id.*, at 33102.

He placed in the Record a staff memorandum stating that the availability of damages "would encourage frivolous or harassing suits against industries and government agencies."  *Id.*, at 33103.  See also *City of Highland Park* v. *Train,* 519 F. 2d 681, 690–691 (CA7 1975), cert. denied, 424 U. S. 927 (1976).

[28] See generally *City of Evansville* v. *Kentucky Liquid Recycling, Inc.,* 604 F. 2d 1008 (CA7 1979), cert. denied, 444 U. S. 1025 (1980).

## B

Although the parties have not suggested it, there remains a possible alternative source of *express* congressional authorization of private suits under these Acts. Last Term, in *Maine* v. *Thiboutot,* 448 U. S. 1 (1980), the Court construed 42 U. S. C. § 1983 as authorizing suits to redress violations by state officials of rights created by federal statutes. Accordingly, it could be argued that respondents may sue the municipalities and sewerage boards among the petitioners[29] under the FWPCA and MPRSA by virtue of a right of action created by § 1983.

It is appropriate to reach the question of the applicability of *Maine* v. *Thiboutot* to this setting, despite the failure of respondents to raise it here or below. This litigation began long before that decision. Moreover, if controlling, this argument would obviate the need to consider whether Congress intended to authorize private suits to enforce these particular federal statutes. The claim brought here arguably falls within the scope of *Maine* v. *Thiboutot* because it involves a suit by a private party claiming that a federal statute has been violated under color of state law, causing an injury. The Court, however, has recognized two exceptions to the application of § 1983 to statutory violations. In *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1 (1981), we remanded certain claims for a determination (i) whether Congress had foreclosed private enforcement of that statute in the enactment itself, and (ii) whether the statute at issue there was the kind that created enforceable "rights" under § 1983. *Id.,* at 28. In the present cases, because we find that Congress foreclosed a § 1983 remedy under these Acts, we need not reach the second question whether these Acts created "rights, privileges, or immunities" within the meaning of § 1983.

---

[29] These petitioners appear to fall within the category of municipal governmental entities suable as "persons" under our decision in *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978).

When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983. As JUSTICE STEWART, who later joined the majority in *Maine* v. *Thiboutot,* stated in *Chapman* v. *Houston Welfare Rights Organization,* 441 U. S. 600, 673, n. 2 (1979) (dissenting opinion), when "a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983." [30] As discussed above, the FWPCA and MPRSA do provide quite comprehensive enforcement mechanisms. It is hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies, including the two citizen-suit provisions.[31] See *Chesapeake Bay Foundation* v. *Virginia State*

---

[30] See also *Meyerson* v. *Arizona,* 507 F. Supp. 859, 864 (Ariz. 1981) ("[T]he remedial provision of § 1983 cannot be used to circumvent the remedial provisions of the Revenue Sharing Act").

[31] JUSTICE STEVENS in dissent finds contrary indications of congressional intent in the saving clauses—§ 505 (e) of the FWPCA, 33 U. S. C. § 1365 (e), and § 105 (g)(5) of the MPRSA, 33 U. S. C. § 1415 (g)(5). The language of these clauses, see nn. 10, 11, *supra,* does not, however, support the view that Congress expressly preserved § 1983 remedies for violations of *these statutes.* As noted, *supra,* at 15–16, there is little reason to believe that Congress intended to do this when it made reference in § 505 (e) to "any right which any person . . . may have under any statute or common law or to seek . . . any other relief." The legislative history makes clear Congress' intent to allow further enforcement of anti-pollution standards arising under *other* statutes or state common law. See n. 26, *supra.* A suit for damages asserting a substantive violation of the FWPCA or the MPRSA is far different, even if the *remedy* asserted is based on the separate right of action created in § 1983. We are convinced that the saving clauses do not refer at all to a suit for redress of a violation of these statutes—regardless of the source of the right of action asserted.

Even if this were not the correct interpretation of the saving clauses, we recently held that the saving clause in the FWPCA relates only to the

*Water Control Board,* 501 F. Supp. 821 (ED Va. 1980) (rejecting a § 1983 action under the FWPCA against the Chairman of a State Water Board, with reasoning based on the comprehensiveness of the remedies provided and the federalism concerns raised). We therefore conclude that the existence of these express remedies demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983. Cf. *Carlson* v. *Green,* 446 U. S. 14, 23 (1980).

## III

The remaining two issues on which we granted certiorari relate to respondents' federal claims based on the federal common law of nuisance. The principal precedent on which these claims were based is *Illinois* v. *Milwaukee,* 406 U. S. 91 (1972), where the Court found that the federal courts have jurisdiction to consider the federal common-law issues raised by a suit for injunctive relief by the State of Illinois against various Wisconsin municipalities and public sewerage commissions, involving the discharge of sewage into Lake Michigan. In these cases, we need not decide whether a cause of action may be brought under federal common law by a private plaintiff, seeking damages. The Court has now held

---

effect of the accompanying citizen-suit provision. *Milwaukee* v. *Illinois,* 451 U. S. 304, 329 (1981) (the section "means only that the provision of [a citizen] suit does not revoke other remedies"). The parallel provision of the MPRSA is equally limited. 33 U. S. C. § 1415 (g)(5) ("The *injunctive relief provided by this subsection* shall not restrict any right which any person . . . may have under any statute or common law") (emphasis added). We therefore are not persuaded that the saving clauses limit the effect of the overall remedial schemes provided expressly in the Acts. In sum, we think it clear that those express remedies preclude suits for damages under § 1983, and that the saving clauses do not require a contrary conclusion.

In so holding, we also note that, contrary to JUSTICE STEVENS' argument, *post,* at 27–28, n. 11, we do not suggest that the burden is on a plaintiff to demonstrate congressional intent to preserve § 1983 remedies.

that the federal common law of nuisance in the area of water pollution is entirely pre-empted by the more comprehensive scope of the FWPCA, which was completely revised soon after the decision in *Illinois* v. *Milwaukee*. See *Milwaukee* v. *Illinois*, 451 U. S. 304 (1981).

This decision disposes entirely of respondents' federal common-law claims, since there is no reason to suppose that the pre-emptive effect of the FWPCA is any less when pollution of coastal waters is at issue. To the extent that this litigation involves ocean waters not covered by the FWPCA, and regulated under the MPRSA, we see no cause for different treatment of the pre-emption question. The regulatory scheme of the MPRSA is no less comprehensive, with respect to ocean dumping, than are analogous provisions of the FWPCA.[32]

We therefore must dismiss the federal common-law claims because their underlying legal basis is now pre-empted by statute. As discussed above, we also dismiss the claims under the MPRSA and the FWPCA because respondents lack a right of action under those statutes. We vacate the judgment below with respect to these two claims, and remand for further proceedings.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, concurring in the judgment in part and dissenting in part.

When should a person injured by a violation of federal law be allowed to recover his damages in a federal court? This seemingly simple question has recently presented the Court with more difficulty than most substantive questions that

---

[32] Indeed, as noted in n. 14, *supra*, the ocean dumping of sewage sludge must end altogether by December 31, 1981. To the extent that Congress allowed some continued dumping of sludge prior to that date, this represents a considered judgment that it made sense to allow entities like petitioners to adjust to the coming change.

come before us.[1] During most of our history, however, a simple presumption usually provided the answer. Although criminal laws and legislation enacted for the benefit of the public at large were expected to be enforced by public officials, a statute enacted for the benefit of a special class presumptively afforded a remedy for members of that class injured by violations of the statute. See *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S. 33, 39–40.[2] Applying that presump-

---

[1] Indeed, in recent Terms a significant portion of our docket has been occupied by cases presenting this question with respect to a variety of federal statutes. See, *e. g.*, *California* v. *Sierra Club*, 451 U. S. 287; *Universities Research Assn.* v. *Coutu*, 450 U. S. 754; *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11; *Touche Ross & Co.* v. *Redington*, 442 U. S. 560; *Cannon* v. *University of Chicago*, 441 U. S. 677. Cf. *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630; *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77.

[2] In the unanimous decision in *Texas & Pacific R. Co.* v. *Rigsby*, this presumption was plainly stated:

"A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law . . . . This is but an application of the maxim, *Ubi jus ibi remedium*." 241 U. S., at 39–40.

As the *Rigsby* Court noted, the presumption was firmly established at common law, see *California* v. *Sierra Club*, *supra*, at 299–300 (STEVENS, J., concurring), and it had been recognized on numerous prior occasions by this Court. See, *e. g.*, *Marbury* v. *Madison*, 1 Cranch 137, 163 (" '[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded' "); *Kendall* v. *United States*, 12 Pet. 524, 623 ("[T]he power to enforce the performance of the act must rest somewhere, or it will present a case which has often been said to involve a monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist"); *Pollard* v. *Bailey*, 20 Wall. 520, 527 ("A general liability created by statute without a remedy may be enforced by an appropriate common-law action"); *Hayes* v. *Michigan Central R. Co.*, 111 U. S. 228, 240 ("[E]ach person specially injured by the breach of the obligation is entitled to his individual com-

tion, our truly conservative federal judges—men like Justice Harlan,[3] Justice Clark,[4] Justice Frankfurter,[5] and Judge Kirkpatrick [6]—readily concluded that it was appropriate to allow private parties who had been injured by a violation of a statute enacted for their special benefit to obtain judicial relief. For rules are meant to be obeyed, and those who violate them should be held responsible for their misdeeds. See *Rigsby, supra,* at 39. Since the earliest days of the common law, it has been the business of courts to fashion remedies for wrongs.[7]

In recent years, however, a Court that is properly concerned about the burdens imposed upon the federal judiciary, the

---

pensation, and to an action for its recovery"); *De Lima* v. *Bidwell,* 182 U. S. 1, 176–177 ("If there be an admitted wrong, the courts will look far to supply an adequate remedy").

[3] See *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 402 (concurring in judgment) ("[I]n suits for damages based on violations of federal statutes lacking any express authorization of a damage remedy, this Court has authorized such relief where, in its view, damages are necessary to effectuate the congressional policy underpinning the substantive provisions of the statute").

[4] See *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 433 ("[I]t is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose").

[5] See *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.,* 341 U. S. 246, 261 (dissenting opinion) ("If civil liability is appropriate to effectuate the purposes of a statute, courts are not denied this traditional remedy because it is not specifically authorized").

[6] See *Kardon* v. *National Gypsum Co.,* 69 F. Supp. 512, 513–514 (ED Pa. 1946) ("The disregard of the command of a statute is a wrongful act and a tort. . . . [T]he right to recover damages arising by reason of violation of a statute . . . is so fundamental and so deeply ingrained in the law that where it is not expressly denied the intention to withhold it should appear very clearly and plainly").

[7] Although the federal courts do not possess the full common-law powers of their state counterparts, see, *e. g., Northwest Airlines, Inc., supra,* at 95, the cases cited in n. 2, *supra,* nonetheless indicate that the fashioning of remedies for wrongs has traditionally been a part of the business of the federal courts.

quality of the work product of Congress, and the sheer bulk of new federal legislation, has been more and more reluctant to open the courthouse door to the injured citizen. In 1975, in *Cort* v. *Ash,* 422 U. S. 66, the Court cut back on the simple common-law presumption by fashioning a four-factor formula that led to the denial of relief in that case.[8] Although multi-factor balancing tests generally tend to produce negative answers, more recently some Members of the Court have been inclined to deny relief with little more than a perfunctory nod to the *Cort* v. *Ash* factors. See, *e. g., California* v. *Sierra Club,* 451 U. S. 287, 302 (REHNQUIST, J., concurring in judgment). The touchstone now is congressional intent. See *ante,* at 13. Because legislative history is unlikely to reveal affirmative evidence of a congressional intent to authorize a specific procedure that the statute itself fails to mention,[9] that touchstone will further restrict the availability of private remedies.

Although I agree with the Court's disposition of the implied-private-right-of-action question in these cases, I write separately to emphasize that the Court's current approach to the judicial task of fashioning appropriate remedies for violations of federal statutes is out of step with the Court's own

---

[8] The unanimous opinion in *Cort* v. *Ash* adopted the single-factor test of *Rigsby,* see n. 2, *supra,* and combined it with three additional inquiries:

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,'—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" 422 U. S., at 78 (citations omitted) (emphasis in original).

[9] See *Cannon, supra,* at 694; *Northwest Airlines, Inc., supra,* at 94.

history and tradition. More importantly, I believe that the Court's appraisal of the intent expressed by Congress in the Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), 33 U. S. C. § 1251 *et seq.* (1976 ed. and Supp. III), and the Marine Protection, Research, and Sanctuaries Act of 1972 (MPRSA), 33 U. S. C. § 1401 *et seq.* (1976 ed. and Supp. III), with respect to the availability of private remedies under other federal statutes or the federal common law is palpably wrong.

In the present context of these cases, we of course know nothing about the ultimate merits of the claims asserted by respondents. As the cases come to us, however, we must make certain assumptions in analyzing the questions presented. First, we must assume that the complaint speaks the truth when it alleges that the petitioners have dumped large quantities of sewage and toxic waste in the Atlantic Ocean and its tributaries, and that these dumping operations have violated the substantive provisions of the Clean Water Act and the MPRSA. See *Northwest Airlines, Inc.* v. *Transport Workers,* 451 U. S. 77, 80, n. 3. Second, we must also assume that these illegal operations have caused an injury to respondents' commercial interests. Third, because some of the petitioners are "persons" who allegedly acted under color of state law, as the Court recognizes, see *ante,* at 19, and n. 29, we must assume that 42 U. S. C. § 1983 (1976 ed., Supp. III) [10] provides an express remedy for their violations of these two federal statutes, unless Congress has expressly withdrawn that remedy. See *Maine* v. *Thiboutot,* 448 U. S. 1. Finally,

---

[10] Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

we must assume that, apart from these two statutes, the dumping operations of petitioners would constitute a common-law nuisance for which respondents would have a federal remedy. The net effect of the Court's analysis of the legislative intent is therefore a conclusion that Congress, by enacting the Clean Water Act and the MPRSA, deliberately deprived respondents of effective federal remedies that would otherwise have been available to them. In my judgment, the language of both statutes, as well as their legislative history, belies this improbable conclusion.

## I

The Court's holding that Congress decided in the Clean Water Act and the MPRSA to withdraw the express remedy provided by 42 U. S. C. § 1983 (1976 ed., Supp. III) seems to rest on nothing more than the fact that these statutes provide other express remedies and do not mention § 1983. Because the enforcement mechanisms provided in the statutes are "quite comprehensive," the Court finds it "hard to believe that Congress intended to preserve the § 1983 right of action . . . ." *Ante,* at 20. There are at least two flaws in this reasoning. First, the question is not whether Congress "intended to preserve the § 1983 right of action," but rather whether Congress intended to withdraw that right of action.[11] Second, I find it

---

[11] This is more than merely a semantic dispute. As the Court formulates the inquiry, the burden is placed on the § 1983 plaintiff to show an explicit or implicit congressional intention that violations of the substantive statute at issue be redressed in private § 1983 actions. The correct formulation, however, places the burden on the defendant to show that Congress intended to foreclose access to the § 1983 remedy as a means of enforcing the substantive statute. Because the § 1983 plaintiff is invoking an express private remedy that is, on its face, applicable anytime a violation of a federal statute is alleged, see *Maine* v. *Thiboutot,* 448 U. S. 1, 4, the burden is properly placed on the defendant to show that Congress, in enacting the particular substantive statute at issue, intended an exception to the general rule of § 1983. A defendant may carry this burden by identifying express statutory language or legislative

28

not at all hard to believe that Congress intended to preserve, or, more precisely, did not intend to withdraw, the § 1983 remedy because Congress made this intention explicit in the language of both statutes and in the relevant legislative history.

I agree with the Court that the remedial provisions of the Clean Water Act and the MPRSA are "quite comprehensive." I cannot agree, however, with the Court's implicit conclusion that this determination ends the inquiry under *Maine* v. *Thiboutot, supra.* The question that must be answered in determining whether respondents may pursue their claims under § 1983 is whether Congress intended that the remedies provided in the substantive statutes be exclusive. See *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 28. Because Congress did not expressly address this question in the statutes, the Court looks elsewhere for an answer and finds it in the comprehensive character of the express statutory remedies. I have no quarrel as a general matter with the proposition that a comprehensive remedial scheme can evidence a congressional decision to preclude other remedies. Cf. *Northwest Airlines, Inc., supra,* at 93–94. However, we must not lose sight of the fact that our evaluation of a statute's express remedies is merely a tool used to discern congressional intent; it is not an end in itself. No matter how comprehensive we may consider a statute's remedial scheme to be, Congress is at liberty to leave other remedial avenues open. Express statutory language or clear references in the legislative history will rebut whatever presumption of exclusivity arises from comprehensive remedial provisions. In my judgment, in these cases we are presented with both express statutory language and clear references in the legislative history indicating that Congress did not intend the

history revealing Congress' intent to foreclose the § 1983 remedy, or by establishing that Congress intended that the remedies provided in the substantive statute itself be exclusive. See *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 28.

express remedies in the Clean Water Act and the MPRSA to be exclusive.

Despite their comprehensive enforcement mechanisms, both statutes expressly preserve all legal remedies otherwise available. The statutes state in so many words that the authorization of an express remedy in the statute itself shall not give rise to an inference that Congress intended to foreclose other remedies. Thus, § 505 (e) of the Clean Water Act states:

> "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)." 33 U. S. C. § 1365 (e).

And, § 105 (g)(5) of the MPRSA states:

> "The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Administrator, the Secretary, or a State agency)." 33 U. S. C. § 1415 (g)(5).

Respondents' right to proceed under § 1983 in light of these statutory provisions could have been made more plain only had Congress substituted the citation "42 U. S. C. § 1983" for the words "any statute" in the saving clauses.

The legislative history of both statutes makes it clear that the saving clauses were intended to mean what they say. The Senate Report on the Clean Water Act states:

> "It should be noted, however, that the section would specifically preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available. Compliance with requirements under this Act would not be a defense to a com-

mon law action for pollution damages." S. Rep. No. 92–414, p. 81 (1971).

See also H. R. Rep. No. 92–911, p. 134 (1972). And the corresponding Report on the MPRSA similarly states that the authorization of citizen suits shall not restrict or supersede "any other right to legal action which is afforded the potential litigant in any other statute or the common law." S. Rep. No. 92–451, pp. 23–24 (1971). See also H. R. Rep. No. 92–361, p. 23 (1971).

The words "any other law" in the former Report and "any other statute" in the latter surely encompass 42 U. S. C. § 1983 (1976 ed., Supp. III), as do the words "any statute" in the saving clauses themselves. It therefore seems little short of remarkable that unambiguous expressions of legislative intent such as these can be read to express a purpose to withdraw the express statutory remedy provided by § 1983.

The Court, of course, discusses the saving clauses and this legislative history elsewhere in its opinion. See *ante,* at 15–17, and n. 26. In rejecting the Court of Appeals' conclusion, based in part on the saving clauses, that respondents may invoke implied rights of action under the Clean Water Act and the MPRSA, the Court finds it "doubtful" that the phrase "any statute" in the saving clauses refers to the very statutes in which the clauses appear. See *ante,* at 15–16. The Court's doubt is reinforced by use of the word "other" in the passages from the Senate Reports quoted above. See *ante,* at 16, n. 26. Thus, the Court holds that the statutory phrase "any statute" does not refer to the Clean Water Act or the MPRSA; the Court apparently also holds that it does not refer to § 1983, even though that statute clearly qualifies as "any *other* statute" or "any *other* law," within the meaning of the legislative history.[12]

---

[12] In a remarkable departure from the "plain language" rule of statutory construction that has dominated our recent statutory decisions, the Court disregards the plain language not only of the two saving provisions, but

In my judgment, the Court has failed to uncover "a clear congressional mandate"[13] to withdraw the § 1983 remedy otherwise available to the respondents. Moreover, the statutory language and the legislative history reveal the exact opposite: a clear congressional mandate to preserve all existing remedies, including a private right of action under § 1983. I therefore respectfully dissent from this portion of the Court's decision.

## II

The effect of the Court's holding in *Milwaukee* v. *Illinois*, 451 U. S. 304, was to make the city of Milwaukee's compliance with the requirements of the Clean Water Act a complete defense to a federal common-law nuisance action for pollution damage. It was, and still is, difficult for me to reconcile that holding with the excerpts from the statutes and the Senate Reports quoted above—particularly the statement:

> "Compliance with requirements under this Act would not be a defense to a common law action for pollution damages." S. Rep. No. 92–414, at 81.

Today, the Court pursues the pre-emption rationale of *Milwaukee* v. *Illinois* to its inexorable conclusion and holds that even noncompliance with the requirements of the Clean Water Act and the MPRSA is a defense to a federal common-law nuisance claim.[14] Because JUSTICE BLACKMUN has al-

---

also of § 1983. Just last Term, we emphasized the plain language of that statute:

"The question before us is whether the phrase 'and laws,' as used in § 1983, means what it says, or whether it should be limited to some subset of laws. Given that Congress attached no modifiers to the phrase, the plain language of the statute undoubtedly embraces respondents' claim that petitioners violated the Social Security Act." *Maine* v. *Thiboutot,* 448 U. S., at 4.

[13] *Carlson* v. *Green,* 446 U. S. 14, 23.

[14] I recognize, of course, that under the pre-emption rationale of *Milwaukee* v. *Illinois,* a defendant's compliance or noncompliance with the

ready exposed in detail the flaws in the Court's treatment of this issue, see *Milwaukee* v. *Illinois, supra,* at 333–347 (dissenting opinion), I merely note that the reasoning in his dissenting opinion in *Milwaukee* applies with special force in this case.[15]

## III

Although I agree with the Court's holding that neither of these statutes implicitly authorizes a private damages remedy, I reach that conclusion by a different route. Under the traditional common-law analysis discussed *supra,* at 23–24, the primary question is whether the statute was enacted for the special benefit of a particular class of which the plaintiff is a member. See *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S., at 39–40. As we have held in the past, "[t]hat question is

---

requirements of the Clean Water Act or the MPRSA is technically irrelevant. However, I point out that the petitioners in these cases allegedly failed to comply with the requirements of the statutes merely to emphasize the anomalous nature of the Court's holdings today and in *Milwaukee,* particularly in light of the statutory language and legislative history discussed in the text.

[15] In his brief for the federal parties, the Solicitor General notes:

"The plain language of the savings clause of the Clean Water Act, 33 U. S. C. 1365 (e), indicates Congress' intent to preserve all common law remedies, and the legislative history makes clear that Congress understood that the federal common law would be preserved as well." Brief for Federal Petitioners 37.

In support of this conclusion, the Solicitor General cites a statement in the legislative history by Congressman Dingell, one of the cosponsors of the Clean Water Act in the House, specifically referring to nuisance litigation under the federal common law. See 118 Cong. Rec. 33757 (1972), 1 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. 93–1, p. 252 (1973). In his statement, Congressman Dingell cited H. R. Rep. No. 92–1401, pp. 31–33 (1972), which quoted with approval from *Illinois* v. *Milwaukee,* 406 U. S. 91, and discussed two federal common-law nuisance actions then being pursued by the Department of Justice against alleged polluters. See also *Milwaukee* v. *Illinois,* 451 U. S., at 343–344 (BLACKMUN, J., dissenting).

answered by looking to the language of the statute itself." *Cannon* v. *University of Chicago,* 441 U. S. 677, 689.

The language of neither the Clean Water Act nor the MPRSA defines any such special class. Both the substantive provisions of these statutes and the breadth of their authorizations of citizen suits indicate that they were "enacted for the protection of the general public." *Cannon, supra,* at 690.[16] Thus, even under the more liberal approach to implied rights of action represented by *Rigsby* and its antecedents, respondents cannot invoke implied private remedies under these statutes. See generally *California* v. *Sierra Club,* 451 U. S., at 294–296.

The conclusion required by the statutory language is fortified by the legislative history on which the Court relies. I agree that the legislative deliberations about civil remedies under the Clean Air Act, see *ante,* at 17–18, n. 27, illuminate the meaning of the Clean Water Act and the MPRSA—since these statutes were enacted only a short time later and had similar environmental objectives—and that those deliberations reveal a conscious congressional choice not to authorize a new statutory damages remedy. Accordingly, I agree with the conclusion reached by the Court in Part II–A of its opinion, but I respectfully dissent from the remainder of its judgment.

---

[16] Both statutes contain general statements of policy that indicate that they were enacted to serve a broad range of interests. Section 101 (a) of the Clean Water Act, as set forth in 33 U. S. C. § 1251 (a), provides, in part:

"The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."

Section 2 (b) of the MPRSA provides:

"The Congress declares that it is the policy of the United States to regulate the dumping of all types of materials into ocean waters and to prevent or strictly limit the dumping into ocean waters of any material which would adversely affect human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities." 33 U. S. C. § 1401 (b).