# Authority of the Federal Financial Supervisory Agencies Under the Community Reinvestment Act

The federal financial supervisory agencies lack authority under the Community Reinvestment Act of 1977 to provide by regulation that financial institutions that do not meet the credit needs of their communities may be subject to administrative enforcement actions under 12 U S.C. § 1818.

December 15, 1994

MEMORANDUM OPINION FOR THE COMPTROLLER OF THE CURRENCY

This memorandum responds to your request for our opinion concerning whether the federal financial supervisory agencies ("the agencies")[1] have authority under the Community Reinvestment Act of 1977 ("CRA"), 12 U.S.C. §§ 2901-2907, to provide by regulation that financial institutions that do not meet the credit needs of their communities may be subject to administrative enforcement actions under 12 U.S.C. § 1818. We conclude that the agencies lack such authority.[2]

## I.

The purpose of the CRA is "to require each appropriate Federal financial supervisory agency to use its authority when examining financial institutions, to encourage such institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound operation of such institutions." 12 U.S.C. § 2901(b). To further this end, the CRA requires the agencies to assess an "institution's record of meeting the credit needs of its entire community," 12 U.S.C. § 2903(a)(1), and to "take such record into account in its evaluation of an application for a deposit facility by such institution." 12 U.S.C. § 2903(a)(2). "[A]pplication for a deposit facility" is defined to include applications for approval to open a branch, to relocate a main or branch office, or to merge with or acquire another institution. 12 U.S.C. § 2902(3). The agencies must prepare a written evaluation of each institution's performance under the CRA, assign a rating to that performance, and disclose that rating to the public. 12 U.S.C. § 2906. The CRA also authorizes the agencies to promulgate regulations to carry out the purposes of the Act. 12 U.S.C. § 2905.

---

[1] The federal financial supervisory agencies are the Office of the Comptroller of the Currency, the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision

[2] The Office of Thrift Supervision ("OTS") has suggested in a letter to this Office that it has sufficient authority under the Home Owners' Loan Act ("HOLA"), 12 U S.C. §§ 1461-1468, to enable it to promulgate and enforce a requirement that regulated institutions help meet the credit needs of their communities. We express no opinion on the authority of OTS or the other agencies under HOLA or any other statute besides the CRA

The agencies have proposed substantial revisions to their regulations imple-
menting the CRA. *See* Community Reinvestment Act Regulations, 58 Fed. Reg.
67,466-67,508 (1993). The proposed regulations provide that financial institutions
"have a continuing and affirmative obligation to help meet the credit needs of their
communities, including low- and moderate-income areas, consistent with safe and
sound operations." *See id.* at 67,479 (§ 25.2). The proposed regulations state that
an institution rated by an agency to be in "Substantial Noncompliance" with that
obligation shall be subject to enforcement actions under 12 U.S.C. § 1818, which
authorizes the agencies to issue cease-and-desist orders and levy civil monetary
penalties. *See id.* at 67,480 (§ 25.6(b)). The potential monetary penalties the in-
stitutions would face range from not more than $5,000 a day for each day during
which a "first tier" violation continues to a maximum daily penalty of $1,000,000
or one percent of the institution's total assets, whichever is lower, for a "third tier"
violation. *See* 12 U.S.C. § 1818(i)(2).

As discussed below, we do not believe that the agencies are authorized to bring
actions under 12 U.S.C. § 1818 to enforce the CRA. Our conclusion is based on
the clearly expressed intent of Congress in enacting the CRA,[3] and rests on two
independent rationales: (1) the CRA application evaluation procedure is the exclu-
sive enforcement mechanism authorized by Congress; and (2) enforcement under
12 U.S.C. § 1818 is unavailable because the CRA does not impose an obligation
that could provide the basis for a § 1818 action or authorize the agencies to impose
such an obligation.

## II.

We believe that Congress has plainly spoken on the question of what enforce-
ment tools are available to the agencies under the CRA. The CRA provides for
enforcement only in the application context, requiring that the agencies shall take
an institution's record of meeting the credit needs of its community into account
when evaluating that institution's application for a deposit facility. Congress speci-
fied only this one enforcement mechanism in the CRA, and we do not believe it is
permissible for the agencies to employ other enforcement mechanisms, on the
authority of the CRA, in the absence of some basis in the text of the statute. Agen-
cies may act only pursuant to delegations of power that are explicit or can fairly be

---

[3] This is therefore not a situation where *Chevron* deference may be relied upon to support an agency
interpretation. In *Chevron U S A. Inc v National Resources Defense Council, Inc*, 467 U S 837 (1984),
the Supreme Court announced a two-step rule for courts to follow when reviewing an agency's construction
of a statute that it administers. The court must always first examine "whether Congress has directly spoken
to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court,
as well as the agency, must give effect to the unambiguously expressed intent of Congress " *Id* at 842-43.
If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is
whether the agency's answer is based on a permissible construction of the statute ˙ *Id.* at 843 As discussed
in the text, we do not believe that the CRA is silent or ambiguous with respect to the authority being vested
in the agencies. Accordingly, there is no basis for deferring to an agency interpretation

implied from the statutory scheme. *See Railway Labor Executives' Ass'n v. National Mediation Bd.*, 29 F.3d 655, 670-71 (D.C. Cir. 1994) (en banc), *cert. denied*, 514 U.S. 1032 (1995).

The CRA contains no express directive for the agencies to use any other modes of enforcement, much less such coercive enforcement as cease-and-desist orders and monetary penalties, and there is no basis for inferring such authority from any provision in the statute. The statute's only general grant of authority to the agencies is the authority to promulgate implementing regulations. We reject the argument that a delegation of broad enforcement authority can be inferred from the statute's delegation of authority to issue implementing regulations and the fact that the CRA does not explicitly state that the agencies may *only* sanction financial institutions through the application process. First of all, the authority to issue regulations is limited to "carry[ing] out the purposes" of the CRA, 12 U.S.C. § 2905, and those purposes are limited to requiring the agencies to "use [their] authority *when examining financial institutions*, to encourage such institutions to help meet the credit needs" of their communities, 12 U.S.C. § 2901(b) (emphasis added). More fundamentally, as the D.C. Circuit wrote recently, "[w]ere courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Railway Labor Executives' Ass'n*, 29 F.3d at 671.

The legislative history of the CRA firmly supports our conclusion that the CRA does not authorize the agencies to employ other methods of enforcement. Neither the House Conference Report nor the Senate Report makes any mention of a method of sanction other than through the application process,[4] and when introducing the bill on the Senate floor, Senator Proxmire stated that "[t]he requirements in the bill apply only to applications otherwise required under existing law or regulations and do not provide any new authority to the bank regulatory agencies." 123 Cong. Rec. 1958 (1977). Similarly, during the floor debate on whether to delete the CRA provisions from the Housing and Community Development Act, Senator Lugar stated that "[t]he sanctions that are finally offered, even if some institution is found guilty in the process, are apparently that the institution would have some difficulty extending its facilities, no more and no less than that." *Id.* at 17,633.

More specifically, it would be inconsistent with the views expressed by Senator Proxmire for the agencies to rely on the CRA for authority to issue cease-and-desist orders or impose monetary penalties. Speaking as the bill's chief sponsor, Senator Proxmire stressed the limited nature of the authority being vested in the

---

[4] In fact, the conference report describes the purposes of the CRA in very modest terms. "This title and other amendments contained in this bill are designed to encourage more coordinated efforts between private investment and federal grants and insurance in order to increase the viability of our urban communities." H R Conf Rep No. 95-634, at 76 (1977), *reprinted in* 1977 U S C C.A N 2965, 2995

agencies. When introducing the bill, Senator Proxmire stated that the CRA "is intended to establish a system of *regulatory incentives* to *encourage* banks and savings institutions to more effectively meet the credit needs of the localities they are chartered to serve." *Id.* at 1958 (emphasis added). During floor debate on the legislation, he stated that "we have to do something to *nudge* [the banks], *influence* them, *persuade* them to invest in their community." *Id.* at 17,630 (emphasis added). He stated during hearings on the CRA that "[w]hat are we [sic] trying to do here is not to provide for any terrible sanction. . . . All we are saying is that the job that you do in servicing community needs *should be taken into consideration as one element* in whether or not branching should be approved. It is a mild proposal, it seems to me." *Community Credit Needs: Hearings on S. 406 Before the Senate Comm. on Banking, Housing and Urban Affairs*, 95th Cong. 323 (1977) (emphasis added).[5]

Finally, it is "an 'elemental canon' of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies." *Karahalios v. National Fed'n of Fed. Employees*, 489 U.S. 527, 533 (1989) (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)).[6] "In such cases, '[i]n the absence of strong indicia of contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.'" *Karahalios*, 489 U.S. at 533 (quoting *Middlesex County Sewerage Auth. v. Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981)). To move from an enforcement scheme that relies upon a system of regulatory incentives to a scheme that entails cease-and-desist orders and potentially substantial monetary penalties is a leap that we do not believe can be justified on the basis of the text, purpose, and legislative history of the CRA. We therefore conclude that enforcement under 12 U.S.C. § 1818 is not authorized by the CRA.

---

[5] Senator Proxmire did state when introducing the conference report on the Senate floor that "the intention [of Congress] is as stated in [12 U S C § 2901(b)] that the agencies use the full extent of their authority, including their general regulatory authority, under [12 U.S C. § 2905], to encourage all regulated depository institutions' responsiveness to community needs." 123 Cong Rec. 31,887 (1977) However, at best this statement is ambiguous, the direction to use full regulatory authority probably was simply in reference to the section of the CRA directing the agencies to promulgate implementing regulations and not to some other grant of enforcement authority such as 12 U S C § 1818. It is impossible to know what regulations Senator Proxmire expected the agencies to issue, although we note that (consistent with the phrasing in CRA's statement of purpose section) he used the word "encourage" to describe what impact the regulations should have on institutions rather than a word like "require " Moreover, we do not believe this one statement, even if read broadly, can support a general grant of enforcement authority to the agencies in light of the statutory text and other legislative history.

[6] That *Karahalios* and the cases cited therein involved claimed private rights of action does not make them inapposite. First, the underlying inquiry of those cases and this case is the same· can congressional intent to enforce a statutory scheme in a particular way be inferred from the statutory language, structure or legislative history? Second, courts if anything have broader power than administrative agencies to fashion appropriate relief, courts, for example, may look to their broad equitable jurisdiction

## III.

We reach the same conclusion when we analyze the question by focusing directly on 12 U.S.C. § 1818. Under that section, the agencies may issue a cease-and-desist order against a financial institution that "is violating or has violated, or ... is about to violate, a law, rule, or regulation," 12 U.S.C. § 1818 (b)(1), and they may impose civil monetary penalties against an institution that violates "any law or regulation" or any cease-and-desist order, 12 U.S.C. § 1818(i)(2). It might be argued that such sanctions may be imposed upon an institution that receives a "substantial noncompliance" CRA rating because that would be a violation of the CRA or the proposed regulations. As discussed below, we reject that argument.

By its terms, the CRA provides only that the agencies must evaluate an institution's record of meeting the credit needs of the community, that the agencies must take that record into account when considering an institution's application for permission to merge or expand, and that the agencies must prepare a written record of their evaluations for public dissemination. Nowhere does the CRA expressly impose any obligation on financial institutions themselves. The statute's references to financial institutions are couched in precatory rather than mandatory terms. In the "statement of purpose" provision of the CRA, Congress stated that "[i]t is the purpose of this chapter to require each appropriate Federal financial supervisory agency to use its authority . . . to *encourage* such institutions to help meet the credit needs of [their] communities." 12 U.S.C. § 2901(b) (emphasis added). The CRA does not instruct the agencies to *require* institutions to meet community credit needs. Moreover, although the CRA directs the agencies to take an institution's record of meeting credit needs into account when evaluating the institution's application for a deposit facility, 12 U.S.C. § 2903, it does not require the agencies to deny applications from institutions with questionable records.[7]

Nor are any obligations, violation of which is sanctionable under § 1818, imposed by the following statements in the "Congressional findings" section of the

---

[7] The case law recognizes that while the agencies are authorized to refuse to approve applications from financial institutions that do not meet the credit needs of their communities, they are not required to do so. In one case that involved a challenge to an agency's approval of an institution's application to open a branch office, the court refused to invalidate the approval on the grounds that the agency and the requesting institution had allegedly failed to comply with the requirements of the CRA *Corning Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 571 F Supp 396 (E.D Ark 1983), *aff'd*, 736 F 2d 479 (8th Cir 1984). The court stated that "[t]he CRA itself does not provide for any sanctions for an unsatisfactory record, nor does it even define what an unsatisfactory record would be The CRA merely requires that the Board assess an institution's community credit record and consider that record when evaluating branch applications." 571 F Supp. at 403 *See also National State Bank v Long*, 630 F 2d 981, 984 (3d Cir. 1980) (in deciding there was no federal law explicitly prohibiting redlining, so that a state anti-redlining statute was not preempted, the court stated that under the CRA, "the Comptroller may, but need not, deny an application for a deposit facility to a national bank that fails to meet the needs of its local community"); *Hicks v Resolution Trust Corp.*, 970 F.2d 378, 382 (7th Cir. 1992) (in concluding that a fired employee could not state a claim for retaliatory discharge because the CRA did not constitute a clearly mandated public policy, the court stated that the Act does not provide for criminal sanctions or private causes of action; agencies may "at most" consider an institution's record when evaluating an application)

CRA: that "[t]he Congress finds that . . . regulated financial institutions have continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered," 12 U.S.C. § 2901(a)(3), and that "[t]he Congress finds that . . . regulated financial institutions are required by law to demonstrate that their deposit facilities serve the convenience and needs of the communities in which they are chartered to do business," 12 U.S.C. § 2901(a)(1). These findings are an indicator of congressional intent and may be looked to by the agencies in formulating their regulations to implement the CRA. However, they are not "operative provisions" of the statute and thus cannot by themselves impose obligations on financial institutions or override operative provisions that indicate that Congress did not intend to impose an obligation violation of which is sanctionable under § 1818. *See Association of Am. R.R. v. Costle,* 562 F.2d 1310, 1316 (D.C. Cir. 1977) ("A preamble no doubt contributes to a general understanding of a statute, but it is not an operative part of the statute and it does not enlarge or confer powers on administrative agencies or officers. Where the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by language in the preamble. The operative provisions of statutes are those which prescribe rights and duties and otherwise declare the legislative will."). *See also Council of Hawaii Hotels v. Agsalud,* 594 F. Supp. 449, 453 (D. Haw. 1984) (in determining whether Hawaii legislature intended to regulate collectively bargained health care plans, court rejected defendants' argument that "findings and purpose" section of statute authorized state regulation of the plans when an operative provision of the statute made it clear that the plans were not subject to regulation).

Finally, we do not believe that the agencies' authority under the CRA to issue implementing regulations includes the authority to impose an obligation, enforceable under § 1818, to meet community credit needs that was not imposed by Congress. The agencies' rulemaking authority is limited to "carry[ing] out the purposes" of the CRA, 12 U.S.C. § 2905, and those purposes are limited to requiring the agencies to use their authority to "encourage" financial institutions to help meet community credit needs, 12 U.S.C. § 2901(b). The authority to "encourage" does not include the authority to impose an obligation enforceable by cease-and-desist orders and money penalties. *See New York v. Heckler,* 719 F.2d 1191, 1196 (2nd Cir. 1983) (holding that statutory language directing entities receiving federal funding "to encourage family participation" in minors' receipt of contraceptive services did not authorize HHS to promulgate regulations requiring parental notification following a minor's purchase of contraception).

We emphasize that our conclusion that § 1818 sanctions are not available is not intended to suggest that the provisions of the proposed CRA regulations regarding an obligation to help meet the credit needs of the community are invalid for other purposes under the CRA or any other statute, such as to assist the exercise of agency authority during examinations and in the application process. Nor is it

254

intended to suggest that other provisions of the proposed CRA regulations impos-ing requirements on financial institutions, such as data collection and reporting requirements, are not authorized by the grant of authority to promulgate regula-tions. Moreover, we express no opinion on the availability of § 1818 sanctions for violations of a law, rule, or regulation in any context other than the CRA.

## IV.

The purpose of the CRA is to require the federal financial supervisory agencies, in the execution of their examination function, to encourage financial institutions to meet community credit needs. The CRA requires that the agencies assess financial institutions' records in this regard and consider their records when evaluating their applications for deposit facilities. In connection with this requirement, the agen-cies may promulgate regulations placing reasonable requirements on financial in-stitutions to enable the agencies to assess their performance. We conclude, however, that the agencies lack authority under the CRA to provide by regulation that financial institutions that do not meet the credit needs of their communities may be subject to enforcement actions under 12 U.S.C. § 1818.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

☆ U.S. GOVERNMENT PRINTING OFFICE: 1999-447-390