**TOWN OF NEW CHICAGO,**
Appellant–Respondent,

v.

**CITY OF LAKE STATION, by the LAKE STATION SANITARY DISTRICT, Appellee–Petitioner.**

No. 45A03–1001–PL–22.

Court of Appeals of Indiana.

Dec. 13, 2010.

Robert F. Peters, Lucas, Holcomb & Medrea, Merrillville, IN, Attorney for Appellant.

James B. Meyer, Meyer & Wyatt, P.C., Gary, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

In 1988 the Town of New Chicago ("New Chicago") and the City of Lake Station ("Lake Station") entered into an intermunicipal agreement for the construction of an interceptor sewer system. The parties' combined water was then sent downstream for treatment at the Gary Sanitary District ("GSD"). In their agreement, the parties agreed to comply with federal law, including the Clean Water Act, and that Lake Station would bill New Chicago monthly at the GSD rate. Although GSD tripled its rate in 1989, Lake Station did not inform New Chicago and continued to bill New Chicago at the old rate. GSD then sued Lake Station in 1999. Again, Lake Station did not inform New Chicago of the lawsuit. After Lake Station paid an over-five-million-dollar judgment to GSD in 2005 for the difference between the old rate it had been paying and the increased rate, Lake Station demanded approximately a half million dollars from New Chicago for its proportionate share of the judgment. When New Chicago did not pay, in 2007 Lake Station filed a two-count complaint against New Chicago seeking to recover the approximately half million dollars for the years 1990 to 2004. New Chicago raised several affirmative defenses, including laches and equitable estoppel.

In this discretionary interlocutory appeal, New Chicago appeals the trial court's grant of partial summary judgment in favor of Lake Station on the issue of liability and denial of its motion for summary judgment. We conclude that there is no private right of action under the Clean Water Act. Accordingly, Lake Station's only viable claim against New Chicago is for breach of contract. We conclude that laches is not available to New Chicago as a defense for Lake Station's breach of contract claim because laches acts as a limitation upon equitable relief, and an action for breach of contract is a legal claim. Nevertheless, we conclude that New Chicago has met its burden of proving the defense of equitable estoppel because: (1) New Chicago lacked the knowledge or means of knowledge that Lake Station was not properly billing them because there was no indication that anything was wrong, (2) New Chicago relied on the monthly billings from Lake Station for more than fifteen years without any sort of notice from Lake Station, and (3) Lake Station's conduct caused New Chicago to prejudicially change its position in that New Chicago was prevented from budgeting for the increased rate or joining in the GSD/Lake Station litigation. Because there is no genuine issue of material fact, we reverse the trial court and direct the court to enter summary judgment in favor of New Chicago on New Chicago's equitable estoppel defense.

### Facts and Procedural History

GSD owns and operates a centralized sewage treatment plant that receives fed-

eral and state grant assistance for expansion and improvement in the quality of treatment. Appellant's App. p. 86. To receive this assistance, GSD was required to permit Lake Station and other cities in northwest Indiana to deposit their waste materials into its plant. *Id.* To that end, in 1982 GSD and Lake Station entered into a sewage treatment contract. *Id.* at 86–87. The contract was amended in 1984. *Id.* at 87.

In 1988 New Chicago and Lake Station did not have adequate means to dispose of their waste water, liquid waste, and sewage. *Id.* at 60. As a result of this inadequacy, on August 16, 1988, New Chicago and Lake Station entered into an Inter-municipal Agreement ("Agreement") for the joint construction of a gravity and interceptor sewer system. *Id.* The Agreement, twenty-one pages in length and approved by each entity's governing board, called for a proportionate division of the costs and expenses of the sewer project. *Id.* In particular, the Agreement gave New Chicago the right to use Lake Station's facilities for the transportation of its sewage downstream to GSD. *Id.* at 62. The Agreement provided that it would not be binding until both parties "receive[d] grants from the Environmental Protection Agency and the State of Indiana pursuant to Public law 92–500." *Id.*

The Agreement required New Chicago and Lake Station to comply with several applicable laws, including the "Federal Water Pollution Control Amendment Act of 1972 (Public Law 92–500) particularly Title II, Section 204(b)" (also known as the Clean Water Act), "the Federal Regulations as contained in the Federal Register Volume 39, No. 29, dated February 11, 1974," and any amendments thereto in order to permit Lake Station, "on a continuing basis," "to receive grants from the U.S. Environmental Protection Agency and the

State of Indiana which may ... in the future offer grants incidental to the collection and treatment of sewage." *Id.* at 62–63. Specifically, New Chicago and Lake Station were required to adopt ordinances enacting a "user charge system," under which all users in their respective jurisdictions had to pay their proportionate share of the costs of operation and maintenance of the sewage system. *Id.* at 63; *see also id.* at 73 ("[Lake Station] and [New Chicago] shall institute, maintain, and enforce a system of user charges in accordance with the guidelines of the U.S. Environmental Protection Agency and other state and federal agencies ...."), 59 (admission by New Chicago that it agreed that each recipient of waste treatment services would pay its proportionate share of the costs of operation and maintenance of the sewage system). The parties also agreed to comply with all applicable state and federal laws "[i]n the construction, maintenance and operation of its sewage system." *Id.* at 63; *see also id.* at 59 (admission by New Chicago that it agreed to comply with all applicable state and federal laws). Finally, New Chicago and Lake Station were required to "enforce their User Charge and Sewer Use Ordinances beginning at the points of discharge from [New Chicago] into [Lake Station's] [sewage] system and downstream to the treatment plant of the [GSD]." *Id.* at 63.

The Agreement governed billing as follows:

12. Billing of Services.

A. [Lake Station] will bill [New Chicago] monthly for the following charges:

1. *Treatment charges at the [GSD] treatment rate,* plus $40.00 per month billing and carrying charge.

2. Excessive strength waste surcharges billed at the rate established by [Lake Station] sewage rate ordinances.

3. One-twelfth of [New Chicago's] portion of the current year's interceptor O M & R [operation, maintenance, and replacement] costs.

4. One-twelfth of the [GSD] capacity charge. (Yet to be determined.)

5. Billing will be on a monthly basis with a penalty charged on all past due billings. The amount of the penalty and the determination of the date when billings are past due will be consistent with [Lake Station's] Sewage Works billing practice for all other customers of the sewage works.

B. [Lake Station] shall have the responsibility of reading the metering devices at the interceptor interconnection point and billing [New Chicago] appropriately. . . .

*Id.* at 71–72 (emphasis added). Also according to the Agreement, Lake Station agreed "to hold harmless and indemnify [New Chicago] from any liability damages losses, expenses or costs and from any, negligence, or failure to act on the party [sic] of [Lake Station] in operation of its sewage system." *Id.* at 77.[1]

New Chicago, in compliance with the Agreement, adopted Ordinance No. 89-8 on August 8, 1989. The ordinance established the schedule of rates, user charges, and surcharges to be collected by New Chicago from the owners of property served by the town's Small Diameter Gravity Sewer System. *Id.* at 95. The ordinance acknowledged that New Chicago had recently signed an agreement with Lake Station for the joint construction and proportionate sharing of construction and

operating costs of a gravity interceptor sewer system which would collect sewage from New Chicago and Lake Station and discharge such sewage to GSD for treatment. *Id.* The ordinance further provided:

WHEREAS, it is necessary to establish a schedule of rates and charges to produce sufficient revenue to provide funds for [New Chicago's] proportionate share of . . . Lake Station's operation and maintenance expenses of the interceptor sewer system and East End Lift Station, [GSD] sewage treatment charges, for the annual debt service resulting from the financing of [New Chicago's] share of the gravity interceptor sewer system, and the operating, maintenance and administrative expenses of [New Chicago] in connection with the construction of [New Chicago's] sewage collection system under the United States Environmental Protection Agency Federal Construction Grant Project No. C–181093. . . .

*Id.*

Pursuant to the 1982 contract between GSD and Lake Station, GSD billed Lake Station at $0.35 per thousand gallons of flow that Lake Station contributed to the GSD sewage system. *Id.* at 218. When the contract was amended in 1984, the rate was increased to $0.39. *Id.* On October 31, 1989, the Interim Director of GSD sent correspondence to the Mayor of Lake Station that on October 17, 1989, the Gary Common Council adopted Ordinance No. 6403, which raised the basic sewage treatment rate to be billed to Lake Station to $1.20 per thousand gallons of flow. *Id.* at

---

1. To the extent that New Chicago argues on appeal that it is entitled to summary judgment on the ground that Lake Station breached the Agreement by failing to bill them according to the terms of the Agreement and therefore New Chicago is entitled to indemnification pursuant to this section, this argument fails.

Even assuming that Lake Station breached the Agreement by failing to bill New Chicago according to the terms of the Agreement, we find that the indemnification clause only covers negligence or failure to act in the actual operation of the sewage system, and not for the administrative act of billing.

218–19. The correspondence indicated that the increased rate was not negotiable and became effective on October 18, 1989. Over a year later, on November 20, 1990, the Mayor of Lake Station sent correspondence to GSD indicating that Lake Station was rejecting the GSD billing as of September 25, 1990, because the rate of $1.20 was unacceptable, and Lake Station was only willing to pay the $0.39 contract rate until a new contract rate was negotiated. *Id.* at 219. Lake Station, who never forwarded the GSD bills to New Chicago but rather only billed New Chicago for its portion, did not notify New Chicago of GSD's demand for an increased rate.

On July 8, 1999, the City of Gary by GSD filed a Complaint for Recovery of Delinquent Fees and Charges against Lake Station to collect the difference between what GSD had been billing Lake Station and the reduced amount that Lake Station had actually been paying GSD. Notably, New Chicago was neither made a party to this litigation nor notified of its filing. GSD filed a motion for partial summary judgment as to Lake Station's liability, which the trial court granted in January 2004. The trial court found that both federal law and the parties' agreement, which specifically required compliance with referenced federal acts and regulations, obligated Lake Station to pay GSD based on Lake Station's proportionate share of GSD's actual expenses for transporting and treating the sewage discharged by Lake Station to GSD. Thereafter, the parties entered into a stipulation that Lake Station owed GSD a principal amount of $4,223,705.92 for treatment charges for the period through December 2004 and a principal amount of $533,156.30 for capital charges through December 2004, for a total of $4,756,862.22. *Id.* at 226–27. On August 1, 2005, a satisfaction of judgment was filed indicating that Lake Station had paid $5,388,755.27, which included interest through July 15, 2005.

From January 1, 1990, through December 31, 2004—the period of time for which Lake Station alleges in this lawsuit that New Chicago is responsible for charges, *see* Appellee's Addend. p. 15—Lake Station did not bill New Chicago at the increased rate that GSD was billing Lake Station. Appellant's App. p. 219 (Stipulation of Facts). Instead, Lake Station billed New Chicago for its proportionate share of the flow at the same rate that Lake Station paid GSD, that is, $0.39 per thousand gallons of flow. *Id.* (Stipulation of Facts). Further, Lake Station never billed New Chicago for its portion of the interceptor costs. *Id.* (Stipulation of Facts). New Chicago timely paid all bills from Lake Station. *Id.* (Stipulation of Facts). Lake Station never mentioned the dispute with GSD nor formally informed New Chicago that it was refusing to pay the higher sewage rate to GSD. In fact, the first time that New Chicago learned about this and the litigation between GSD and Lake Station was in May 2005. The attorney for the Lake Station Sanitary District contacted the Clerk–Treasurer for New Chicago. *Id.* at 108. In a letter, Lake Station briefly referenced its litigation with GSD and then demanded $536,341.84 as New Chicago's proportionate share of the over-five-million-dollar payout. *Id.*

Then, on May 15, 2006, Lake Station submitted a formal bill to New Chicago for its portion of the interceptor costs and for its proportionate share of the judgment that Lake Station paid to GSD. *Id.* at 219 (Stipulation of Facts). In November 2006, Lake Station's attorney sent New Chicago's attorney Lake Station's accounting firm's report detailing the amount of past due sewage treatment charges that New Chicago owed Lake Station. *Id.* at 138, 139. The charges were based on a fifteen-

year period from January 1, 1990, through December 31, 2004, and included interest. *Id.* at 139, 141. Lake Station also sought New Chicago's proportionate share of the interceptor costs including interest for the same time period. *Id.* at 139, 146. The treatment charges and interest were $516,327.38, and the interceptor expenses plus interest were $20,014.46, for a grand total of $536,341.84.

When New Chicago did not make payment, on March 23, 2007, Lake Station by the Lake Station Sanitary District filed a two-count Complaint for Recovery of Delinquent Fees and Charges against New Chicago. Count I alleged that New Chicago violated state and federal law, and Count II alleged breach of contract. The Complaint alleges in pertinent part:

4. [New Chicago's] waste water, liquid waste and sewage is [sic] transported by [Lake Station] to [GSD].

5. The laws of the State of Indiana and the United States of America require that [New Chicago] must pay its proportionate share of the costs incurred by [Lake Station] in the transportation of its waste water, liquid waste and sewage by [Lake Station] to [GSD].

6. Pursuant to state and federal law, [New Chicago] is required to pay [Lake Station] its proportionate share of [Lake Station's] costs related to all party's [sic] use of [GSD] facilities in the form of user fees and capital charges which legal requirements supersede any contractual arrangements.

7. On August 16, 19[8]8, [Lake Station] and [New Chicago] entered into an agreement calling for [New Chicago] to pay its proportionate share of the costs and expenses incurred by [Lake Station] in the disposition of [New Chicago's] waste water, liquid waste and sewage. . . .

8. For services rendered to date [New Chicago] has been properly billed, but has failed to pay [Lake Station] [its] proportionate share of user fees and capital charges and is delinquent a in [sic] sum in excess of $500,000.00.

9. User fees and any capital amounts due and owing have been billed by [Lake Station] as accounts stated; [New Chicago] has failed to object to said bills within a reasonable period of time and has failed [to] pay them.

*Id.* at 11–12, 13. Lake Station sought penalties, attorney fees, and prejudgment interest. *Id.* at 12, 13.

New Chicago filed an answer, which it later amended, alleging numerous affirmative defenses, including laches and equitable estoppel. New Chicago also filed a counterclaim alleging that Lake Station submitted invoices at the much lower rate of $0.39 even though GSD had substantially increased its rate to Lake Station and the Agreement provided that Lake Station would bill New Chicago at the GSD rate. New Chicago further alleged that this conduct, which continued for a period of over ten years, constituted a breach of the Agreement. *Id.* at 43. New Chicago claimed that as a direct result, it has suffered "a legal detriment in that it is now alleged to be delinquent in an amount in excess of $445,000 for its pro rata share of treatment costs. . . ." *Id.* New Chicago also alleged that Lake Station breached the Agreement by failing to bill them over the years for the interceptor costs, for which Lake Station was now seeking to recover over $17,000 from New Chicago. *Id.* at 44.

Lake Station filed a motion for partial summary judgment on the issue of liability. Specifically, Lake Station argued that "[b]ased on the undisputed Agreement between the parties and [New Chicago's] own ordinance, [New Chicago] agreed to comply with federal and state law and

regulations and pay its proportionate share of [Lake Station's] costs." *Id.* at 55. New Chicago responded by filing a motion for summary judgment as to all issues. Specifically, New Chicago argued that it was entitled to summary judgment on the basis of: "(1) the doctrine of equitable estoppel; (2) the doctrine of laches; and (3) the breach by [Lake Station] of the intermunicipal agreement and its responsibility, under the agreement, to indemnify and hold [New Chicago] harmless from damages, losses, or expenses occasioned by [Lake Station's] negligence or failure to act." *Id.* at 124. In the event that the trial court did not grant summary judgment as to all issues, New Chicago requested partial summary judgment on the issues of prejudgment interest and "the application of the relevant statutes of limitation provisions set forth at I.C. 34–11–2–9 and/or I.C. 34–11–2–11, each of which would restrict the period of time [Lake Station] may go back to assess sewer treatment charges that were never billed." *Id.* at 125.

In November 2009 the trial court granted partial summary judgment in favor of Lake Station as to liability and denied New Chicago's motion for summary judgment. The trial court's conclusions provide in pertinent part:

3. 40 C.F.R. § 35.935–13 states: "The grantee shall obtain the approval of Regional Administrator of its system of user charges.... The grantee must obtain approval of its user charge system based on actual use or *ad valorem* taxes before July 1, 1979 ... and the grantee shall enact them before the treatment works constructed with the grant are placed in operation." Furthermore, 40 C.F.R. § 35.2140(h) specifically provides that the federal regulatory requirements for a sewer user charge system take precedent over any agreements that are in conflict with the federal Clean Water Act. *See also* Indiana Code § 36–9–25–12 which states that a sanitation board may establish just and equitable fees for sewage treatment that must be paid by any use of the sewage work.

4. Section 204(b)(1)(A) of the Clean Water Act provides, in pertinent part, that sewer user charge systems must assure that "... a recipient of waste treatment services will pay its proportionate share ... of the costs of operation and maintenance (including replacement) of any waste treatment services." 33 U.S.C.A. § 1284(b)(1)(A). Proportionate share is to be determined by each user's "contribution to the total cost of operation and maintenance of such works by each use class, taking into account the total waste water loading of such works, the constituent elements of the waste, and other appropriate factors." 33 U.S.C. § 1284(b)(1).

5. The court finds that the Supremacy Clause of the U.S. Constitution, federal law being the supreme law of the land, and the Indiana Code do not conflict as to the establishment of end user fees for the use of sewage services, nor would the public policy and the interest of the general public ... be violated if the Lake Station's customers, present and future, were required to pay for the services that New Chicago and its customers have received.

6. In Indiana, the general rule in contract construction is that the intention of the parties to a contract is to be determined from the "four corners" of the document. Where no defect in the formation of a contract is alleged, the language of the contract, if unambiguous, is conclusive upon the question of the parties' intentions. Words used in a contract must be given their common meaning unless, from the entire contract and the subject matter thereof, it is clear

that some other meaning was intended. . . .

7. The court finds that the Agreement allows for rate reviews and adjustments, and shall enforce a system of user charges. Therefore New Chicago has an obligation to pay Lake Station its proportionate share of the sewage that it contributed to the [sic] Lake Station's sewer system.

8. The general rule is that government entities are not subject to estoppel. The sole exception to the rule that equitable estoppel cannot be applied against governmental entities is that estoppel may be applied if the public interest would be threatened by the government's conduct. Estoppel has been found appropriate in circumstances which do not involve the unauthorized use of taxpayers' funds, where limitations on government authority are not clear, and when estoppel is consistent with the government's interest.

9. A party asserting an estoppel defense must prove its (1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially. Due to the rule that estoppel is only permitted if there is an actual misrepresentation or a failure to disclose when there is a duty to do so "[t]he conduct must be of a caliber calculated to lead the other party to inaction. So where the parties stand on an equal footing, and are not in a fiduciary relationship the law will not protect a party who fails to exercise common sense and judgment.["]

10. The parties['] Agreement did not require the [sic] Lake Station to provide any information or documentation to New Chicago other than upon New Chicago's request. Furthermore New Chicago did not designate any evidence, nor is there any in the record before the Court at this time that would establish that New Chicago made any request for information or documentation from Lake Station, or any evidence that New Chicago did not have access to the information or documentation upon their request.

11. The Court finds that Lake Station is not estopped from imposing the new higher rates and additional charges on New Chicago, as a proportionate share of its sewage obligation to GSD. Lake Station did not seek an unfair advantage over New Chicago, or did it actively conceal or misrepresent its litigation, nor the facts around their dispute on rates with the GSD.

12. Laches is an equitable defense that may be raised to stop a person from asserting a claim that he would normally be entitled to assert. The rationale behind the doctrine of laches is that a person who, for an unreasonable length of time, has neglected to assert a claim against another waives the right to assert his claim when this delay prejudices the person against whom he would assert it. Equitable defenses, such as laches, typically may not be asserted against the government when it acts in its sovereign capacity to protect the public welfare.

13. The doctrine of laches consists of three elements: (1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances resulting in prejudice to the adverse party. No one element, not even the passage of time, is sufficient to demonstrate laches.

14. The debt Lake Station is attempting to collect from New Chicago arose in

mid 2005 when Lake Station incurred the cost of paying the GSD agreed judgment. The fact that New Chicago's obligation to pay the full amount was delayed 15 years until Lake Station paid the agreed judgment was a benefit to New Chicago in that during the elapsed time it continued to pay its contracted lower rate. Furthermore Lake Station has not charged nor has it attempted to collect from New Chicago any of the costs of its litigation with GSD, resulting in New Chicago receiving the substantial benefit of a reduced and greatly delayed bill.

\*　　\*　　\*　　\*　　\*　　\*

IT IS THEREFORE ORDERED that summary judgment is hereby GRANTED in favor of plaintiff, CITY OF LAKE STATION, by the LAKE STATION SANITARY DISTRICT, as a matter of law, and against respondent the TOWN OF NEW CHICAGO relating to the parties['] Agreement concerning New Chicago will pay its proportionate share of the actual costs Lake Station has incurred for providing sewage transport and treatment services to New Chicago.

The issues of the precise amounts owed by NEW CHICAGO to LAKE STATION, what if any, prejudgment interest, costs, litigation expenses, or attorneys' fees New Chicago may owe Lake Station and any other issues raised by the pleadings remain to be decided through the pending litigation.

*Id.* at 7–10 (citations omitted).

Upon New Chicago's request, the trial court certified its order for interlocutory appeal. This Court accepted jurisdiction of this case pursuant to Indiana Appellate Rule 14(B).

## Discussion and Decision

New Chicago contends that the trial court erred in granting partial summary judgment in favor of Lake Station on the issue of liability and in denying its motion for summary judgment. We review the grant or denial of summary judgment *de novo*. *Tri–Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1001 (Ind.2009), *reh'g denied*. In so doing, we stand in the same position as the trial court and must determine whether the designated evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1269–70 (Ind.2009). In making this determination, we construe the evidence in a light most favorable to the non-moving party and resolve all doubts as to the existence of a genuine factual issue against the moving party. *N. Ind. Pub. Serv. Co. v. Bloom*, 847 N.E.2d 175, 180 (Ind.2006). The fact that the parties have filed cross-motions for summary judgment does not alter our standard of review, as we "consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *T–3 Martinsville, LLC v. U.S. Holding, LLC*, 911 N.E.2d 100, 109 (Ind.Ct.App.2009) (quotation omitted), *clarified on reh'g*, 916 N.E.2d 205 (Ind.Ct.App.2009), *trans. denied.*

### I. Clean Water Act

New Chicago contends that the trial court erred in granting partial summary judgment in favor of Lake Station as to liability. Lake Station argues that the Clean Water Act and federal regulations required New Chicago to pay its proportionate share of (1) the interceptor costs and (2) the judgment that Lake Station paid to GSD in 2005 for treatment charges. New Chicago responds that only the EPA

Administrator can bring an action based on the Clean Water Act. Because the Administrator is not involved in this litigation, New Chicago's argument continues, Lake Station's only remedy is for breach of contract, which is an issue governed by state law and subject to various defenses. Accordingly, New Chicago asserts that the trial court improperly granted partial summary judgment in favor of Lake Station based solely on the Clean Water Act.

In 1972 the federal Clean Water Act ("CWA") (also known as the Federal Water Pollution Control Act) was passed. 33 U.S.C. § 1251 *et seq.* The CWA declares, among other things, that it is the "national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State." 33 U.S.C. § 1251(a)(5). The CWA provides that "[e]xcept as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") *shall administer* this chapter." *Id.* § 1251(d) (emphasis added).

According to the CWA, when a sewage treatment plant is constructed with funds from a federal grant, such as in the present case, a condition of receipt of those funds is that the Administrator must determine that the grant applicant:

(A) has adopted or will adopt a system of charges to assure that each recipient of waste treatment services within the applicant's jurisdiction, as determined by the Administrator, will pay its proportionate share (except as otherwise provided in this paragraph) of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant[.]

*Id.* § 1284(b)(1); *see also City of New Brunswick v. Borough of Milltown,* 519 F.Supp. 878, 885 (D.N.J.1981) (only after a municipality applies to the EPA for grant assistance is that municipality obligated to comply with all requirements and conditions of the grant program, including the user charge requirement). Related provisions contained in the Code of Federal Regulations provide as follows:

The Regional Administrator may approve a user charge system based on either actual use under paragraph (a) of this section or ad valorem taxes under paragraph (b) of this section. The general requirements in §§ 35.929–2 and 35.929–3 must also be satisfied.

(a) User charge system based on actual use. A grantee's user charge system based on actual use (or estimated use) of waste water treatment services may be approved if each user (or user class) pays its proportionate share of operation and maintenance (including replacement) costs of treatment works within the grantee's service area, based on the user's proportionate contribution to the total waste water loading from all users (or user classes). To insure a proportional distribution of operation and maintenance costs to each user (or user class), the user's contribution shall be based on factors such as strength, volume, and delivery flow rate characteristics.

40 C.F.R. § 35.929–1.

(b) Biennial review of operation and maintenance charges. *The grantee shall review not less often than every 2 years the waste water contribution of users and user classes, the total costs of operation and maintenance of the treatment works, and its approved user charge system. The grantee shall revise the charges for users or user classes* to accomplish the following:

(1) Maintain the proportionate distribution of operation and maintenance

costs among users and user classes as required herein;

(2) Generate sufficient revenue to pay the total operation and maintenance costs necessary to the proper operation and maintenance (including replacement) of the treatment works; and

(3) Apply excess revenues collected from a class of users to the costs of operation and maintenance attributable to that class for the next year and adjust the rate accordingly.

\* \* \* \* \* \*

(e) Adoption of system. One or more municipal legislative enactments or other appropriate authority must incorporate the user charge system. If the project is a regional treatment system accepting wastewaters from other municipalities, the subscribers receiving waste treatment services from the grantee shall adopt user charge systems in accordance with section 204(b)(1)(A) of the Act and §§ 35.929 through 35.929–3. These user charge systems shall also be incorporated in appropriate municipal legislative enactments or other appropriate authority of all municipalities contributing wastes to the treatment works.

*Id.* § 35.929–2 (emphasis added).

(a) When a grantee's user charge system is approved, implementation of the approved system shall become a condition of the grant.

*Id.* § 35.929–3; *see also id.* §§ 35.935–13 ("The grantee shall obtain the approval of the Regional Administrator of its system of user charges."), 35.929 ("The Regional Administrator shall approve the grantee's user charge system and the grantee shall implement and maintain it in accordance with § 35.935–13 and the requirements in §§ 35.929–1 through 35.929–3. The grantee

shall be subject to the noncompliance provisions of § 35.965 for failure to comply.").

Here, it is undisputed that the Agreement provides that New Chicago and Lake Station would comply with the CWA and other applicable regulations and that New Chicago would pay Lake Station based upon its proportionate share of the interceptor costs and treatment charges at GSD. And the federal regulations provide that rates are to be revised every two years to maintain the proportionate distribution of operation and maintenance costs among users and user classes. *Id.* § 35.929–2. It is also undisputed that New Chicago enacted an ordinance establishing a user charge system. There is no allegation that New Chicago did not pay for its share of the treatment costs; rather, the allegation is that New Chicago did not pay for its share at GSD's increased rate.

■ There is no private right of action under the CWA. *Templeton Bd. of Sewer Comm'rs v. Am. Tissue Mills of Mass., Inc.,* 352 F.3d 33, 37 (1st Cir.2003) (citing *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)); *see also City of Detroit v. State of Michigan,* 538 F.Supp. 1169, 1170 (E.D.Mich.1982) (33 U.S.C. § 1284(b)(1)(A) and 40 C.F.R. § 35.929–1 "adequately provide for enforcement by the Administrator and no private cause of action can be implied.... Nothing in section 1284(b)(1)(A) suggests that Congress intended that it be enforced by anyone but the Administrator of the EPA, indeed it reads simply as a prohibition to the Administrator.... At best it simply describes a condition to the receipt of federal grants."). In *National Sea Clammers,* the United States Supreme Court stated that "[i]n view of the[ ] elaborate enforcement provisions [of the CWA] it cannot be assumed that Congress intended to authorize by implication addi-

tional judicial remedies for private citizens suing under [the CWA]." 453 U.S. at 14, 101 S.Ct. 2615.[2] Because there is no private right of action under the CWA, Lake Station cannot seek enforcement of the CWA for New Chicago's failure to pay its proportionate share (at the much higher rate) of the treatment costs at GSD based solely on the CWA (Count I of Complaint). As explained below, Lake Station's remedy, if any, is for breach of contract (Count II).

The First Circuit addressed a party's alleged violation of the CWA and the appropriate remedy in *Templeton Board of Sewer Commissioners*. In 1974 the Town of Templeton entered into a Waste Management Contract with Baldwinville Products, Inc., and its owner, Erving Industries, Inc., by which Templeton agreed to build a wastewater treatment plant and make the plant available to Erving and Baldwinville for treatment of their wastewater. *Templeton Bd. of Sewer Comm'rs*, 352 F.3d at 34. The contract provided that Templeton would retain legal title to the plant, Templeton would pay $1.00 per year consideration for Erving and Baldwinville to operate the plant, Templeton would apply for federal and/or state construction grants for the plant, and Erving and Baldwinville would pay the net operating costs of the plant as well as 95.5% of the net capital costs of the plant. *Id.* Templeton applied to the EPA for a construction grant. *Id.* The agency approved the grant, and the plant was built and became operational. *Id.*

In 1991 American Tissue Mills of Massachusetts, Inc. ("ATM") purchased Baldwinville's operating assets, and Baldwinville's rights and liabilities under the Waste Management Contract were assigned to Northeast Waste Treatment Services, Inc. *Id.* at 34–35.

In 1995 the EPA informed Templeton that the CWA required Templeton to implement a user charge system whereby each user of the plant must pay a proportionate share of the cost of operating and maintaining the entire wastewater treatment system based upon that user's contribution to the total waste flow. *Id.* at 35. The EPA also advised Templeton that the user charge system specified by the Waste Management Contract was inconsistent with the user charge system required by the CWA. *Id.*

In 1996 Templeton filed a complaint in federal district court. *Id.* Templeton sought a declaration of the parties' rights, specifically, whether ATM was required to pay a user charge which included payment for other treatment works pursuant to the CWA and the EPA regulations. *Id.* Federal jurisdiction was based on the CWA. *Id.* ATM filed a motion to dismiss for lack of subject matter jurisdiction because the issue did not arise under federal law. *Id.* at 36.

In addressing the jurisdictional issue, the First Circuit first determined that there is no private right of action under the CWA. *Id.* at 37. Therefore, a cause of action was not created under federal law. *Id.* at 37, 40. The Court then determined that federal jurisdiction did not exist under any other tests used to establish federal question jurisdiction. *Id.* at 40–41. The First Circuit concluded that Templeton's complaint did not present a question of federal law but rather was, "at its core, a breach of contract claim." *Id.* at 41. The Court noted that even assuming that a

---

2. The CWA does authorize a "citizen suit" in limited circumstances. *See* 33 U.S.C. § 1365. Lake Station does not allege that it followed the detailed procedures set forth in this sec- tion or that there was a violation of an "effluent standard or limitation," which is required for bringing such a suit.

federal issue existed, it was "tangential to the parties' contractual rights." *Id.* "We can discern nothing more in this cause of action than a state law breach of contract claim over which the district court did not have subject matter jurisdiction." *Id.* .

The same can be said in the present case. Because Lake Station cannot enforce the CWA but rather only the Administrator can do so, Lake Station's claim is simply for breach of contract, which it alleged in Count II of its Complaint. Accordingly, the trial court improperly granted summary judgment in favor of Lake Station based solely on the CWA.[3]

## II. Breach of Contract

New Chicago next argues that the trial court erred by failing to grant summary judgment on Lake Station's breach of contract claim in its favor based upon the defenses of laches and equitable estoppel. New Chicago also argues that in the event summary judgment is not granted in its favor on one of these defenses, Lake Station's "recovery, if any, must be restricted by the statute of limitation provisions applicable to" this case. Appellant's Br. p. 28.

■ Laches is an equitable doctrine. *SMDfund, Inc. v. Fort Wayne–Allen County Airport Auth.,* 831 N.E.2d 725, 728

(Ind.2005). The general doctrine is well established and long recognized: "Independently of any statute of limitation, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them." *Id.* at 729; *see also Shafer v. Lambie,* 667 N.E.2d 226, 231 (Ind.Ct.App. 1996) (holding that laches may bar a plaintiff's claim even though the applicable statute of limitations has not yet expired if the laches are of such character as to work an equitable estoppel, which contains the additional element of reliance by the defendant). Laches requires: (1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party. *SMDfund,* 831 N.E.2d at 728; *Shafer,* 667 N.E.2d at 231.

■ Laches, however, acts as a limitation upon *equitable* relief. 12 I.L.E. *Laches* § 26 (2009). "An action for breach of contract is a *legal* claim, such that laches will not operate to bar the claim when the applicable limitations period has not run." 17B C.J.S. Contracts § 608 (1999) (emphasis added). "Thus, mere delay or laches, short of the statutory period of limitations and not connected with such

---

3. Lake Station argues that three cases support its position. One of these cases is *Messina v. Bridgeport Water Pollution Control Authority,* 3 Conn. L. Rptr. 165, 1991 WL 27963 (Conn.Sup.Ct.1991), which is an unpublished decision by the Superior Court of Connecticut. New Chicago argues in its reply brief that Indiana Appellate Rule 65(D) prohibits Lake Station from citing it. On August 30, 2010, Lake Station filed a Motion to Amend Appellee's Brief to Correct Scrivener's Error to "add wording previously erroneously omitted stating that [*Messina* ] is only included for its persuasive value" because it is unpublished.

Indiana Appellate Rule 65's prohibition against citing not-for-publication memoran-

dum decisions applies only to decisions of the Indiana Court of Appeals. *See* Ind. Appellate Rule 65(D). Connecticut's Practice Book § 5–9 provides, "An opinion which is not officially published may be cited before a judicial authority only if the person making reference to it provides the judicial authority and opposing parties with copies of the opinion." Therefore, unlike Indiana, Connecticut does not prohibit citation to its unpublished decisions. Because we may consider *Messina,* we deny Lake Station's motion.

In any event, we find that the three cases that Lake Station cites are distinguishable and thus do not find them persuasive.

facts as may amount to an estoppel, is not a bar to an action at law on the contract." *Id.; see also SMDfund,* 831 N.E.2d at 729 ("Because this action [for declaratory judgment] is equitable, laches may operate to bar the claim."). Accordingly, laches is not available to New Chicago as a defense for Lake Station's breach of contract claim.

We now turn to New Chicago's equitable estoppel defense. Estoppel is a judicial doctrine sounding in equity. *Brown v. Branch,* 758 N.E.2d 48, 51 (Ind. 2001). Although variously defined, it is a concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct. *Id.* at 51–52. There are a variety of estoppel doctrines including: estoppel by record, estoppel by deed, collateral estoppel, equitable estoppel (also referred to as estoppel *in pais* ), promissory estoppel, and judicial estoppel. *Id.* at 52 (citing 28 Am.Jur.2d *Estoppel & Waiver* § 2 (2000)). All, however, are based on the same underlying principle: one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other. *Id.* (citing 31 C.J.S. Estoppel & Waiver § 2 (1996)). "Estoppels are as readily and fully recognized in courts of law as in courts of equity." 28 Am.Jur.2d Estoppel & Waiver § 3; *see also id.* § 160 ("Although originally only available in the courts of equity, in modern times estoppel generally may be raised in a court of law as well so long as any special pleading requirements are met." (footnotes omitted)).

Specifically, equitable estoppel is available only as a defense. 28 Am. Jur.2d *Estoppel & Waiver* § 35. "The party claiming equitable estoppel must show its (1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially." *Money Store Inv. Corp. v. Summers,* 849 N.E.2d 544, 547 (Ind.2006). The party claiming estoppel has the burden to show all facts necessary to establish it. *Story Bed & Breakfast, LLP v. Brown County Area Plan Comm'n,* 819 N.E.2d 55, 67 (Ind.2004). Equitable estoppel may arise from silence or acquiescence as well as from positive conduct. *City of New Albany v. Cotner,* 919 N.E.2d 125, 133–34 (Ind.Ct.App.2009), *reh'g denied, trans. denied.* However, silence will not form the basis of an estoppel unless the silent party has a duty to speak. *Id.* at 134.

The basis for equitable estoppel is fraud, either actual or constructive, on the part of the person estopped. *Paramo v. Edwards,* 563 N.E.2d 595, 598 (Ind. 1990); *Hysell v. Kimmel,* 834 N.E.2d 1111, 1115 (Ind.Ct.App.2005), *reh'g denied, trans. denied; see also* 28 Am.Jur.2d *Estoppel & Waiver* § 29 ("The proper function of equitable estoppel is the prevention of fraud, actual or constructive, and the doctrine should always be so applied as to promote the ends of justice and accomplish that which ought to be done between man and man." (footnotes omitted)). Constructive fraud arises by operation of law from conduct which, if sanctioned by law, would secure an unconscionable advantage. *Paramo,* 563 N.E.2d at 598; *Hysell,* 834 N.E.2d at 1115. Equitable estoppel is not limited to circumstances in which an actual false representation or concealment of existing material fact occurred. *Little v. Progressive Ins.,* 783 N.E.2d 307, 315 (Ind. Ct.App.2003), *trans. denied.* Consequently, a party need not prove that fraud occurred. *Id.*

New Chicago claims that the trial court should have granted summary judgment in its favor based on the defense of equitable estoppel because it is

> uncontroverted in this case that [Lake Station misled New Chicago] when it concealed the fact that it was refusing to pay the GSD rate that was being billed by GSD to [Lake Station] and billed an improper rate over a fourteen (14) year period to [New Chicago]. [New Chicago] had no reason to suspect that [Lake Station] was refusing to accept and pay the sums being billed by GSD. It is further obvious that [New Chicago] relied upon the bills being accurate over the fourteen (14) years in question and believed that nothing further was owed. [New Chicago] did not have equal knowledge of the unilateral action [Lake Station] took when it protested the GSD billings and paid a lesser rate. It did not have equal knowledge of the GSD lawsuit versus [Lake Station]. Lastly, [New Chicago's] position was dramatically changed and prejudiced because it never had the opportunity to amend its user charge system during any of the years in question to raise the amounts that are now claimed as due and owing. The result is that none of the actual users of the sewage system during the time period in question were billed and, now, [New Chicago] would be forced to charge current resident and business users for sewage treatment charges that were never incurred by them.

Appellant's Br. p. 18–19.

■ As for the first element of equitable estoppel, Lake Station argues that New Chicago did not lack the knowledge or the means of knowledge because New Chicago could have asked it for the GSD billings, which would have reflected the increased rate. In addition, Lake Station asserts that the litigation which ensued between it and GSD in 1999 was a matter of public record, and New Chicago had the means of discovering such litigation.

We do not find Lake Station's argument persuasive because there is no genuine issue of material fact that Lake Station did not notify New Chicago that it formally objected in 1990 to GSD's 1989 rate increase, that it refused to pay the increased rate, and that it instead continued to pay the old rate for over fifteen years. Since Lake Station continued to send monthly bills at a consistent rate throughout all of the years in question, there was nothing unusual which would have put New Chicago on notice that there may have been a problem or that it was not paying the correct amount. Therefore, there was no reason for New Chicago to request any documentation from Lake Station regarding the GSD billings. In addition, there was no reason for New Chicago to search public records for a lawsuit concerning Lake Station for the simple reason that Lake Station was a party with which New Chicago had contracted. New Chicago has thus proven the first element of equitable estoppel, lack of knowledge and the means of knowledge as to the facts in question.

■ The second element of equitable estoppel is whether New Chicago has shown reliance upon the conduct of Lake Station. According to paragraph 12 of the Agreement, Lake Station was required to bill New Chicago monthly for treatment charges at the GSD rate. Lake Station was also required to bill New Chicago monthly for one-twelfth of New Chicago's portion of the interceptor costs. Because, pursuant to the Agreement, Lake Station had a duty to bill New Chicago appropriately and New Chicago paid those monthly billings for over fifteen years—during which it is undisputed that Lake Station never gave any notice to New Chicago—

New Chicago has established reliance, the second element of equitable estoppel.

■ As for the final element of equitable estoppel, Lake Station argues that its conduct did not cause New Chicago to prejudicially change its position. Lake Station also points to the general rule that government entities are not subject to estoppel. New Chicago responds that had Lake Station notified them that it was refusing to pay GSD at the increased rate, it

> could have taken protective action to insulate itself from the accrual of the huge expenses and costs that [Lake Station] is now attempting to collect. . . . [New Chicago] could have paid [Lake Station] at the true GSD rate from the very beginning irrespective of whether [Lake Station] wished to challenge the GSD rate. [New Chicago] further could have chosen to pay all of the funds in question into an escrow account pending the resolution of the dispute between [Lake Station] and GSD. [New Chicago] could have become involved in the litigation filed by GSD against [Lake Station] on July 8, 1999. . . . But without notice, [New Chicago] could take none of these actions. Now [New Chicago] is faced with a claim currently in excess of $600,000.00 for which [it] has no ability to pay. [New Chicago], if [Lake Station] is successful in this lawsuit, will be required to incur additional expenses of issuing a bond in order to pay the sums in question. In order to pay the bond, [New Chicago] would have to bill its current residents and businesses for the expenses and costs that should have been incurred and paid by different residential and commercial users during the fourteen (14) years in question.

*Id.* at 17–18.

We agree with New Chicago that its position has prejudicially changed. Lake Station did not notify New Chicago that GSD tripled the rate in 1989, yet Lake Station chose to pay the old rate. Lake Station did not notify New Chicago that GSD filed a lawsuit against it in 1999. Rather, Lake Station only "notified" New Chicago in 2005—which was after Lake Station entered into an agreed judgment with GSD for over five million dollars—by demanding a half million dollars from New Chicago for its proportionate share of the judgment. From 1989 to 2005, New Chicago had at its disposal a myriad of options that it could have taken to protect itself and its sewage customers. For example, New Chicago could have budgeted for the potential shortfall pending the outcome of the GSD/Lake Station litigation. Or, New Chicago could have joined the GSD/Lake Station litigation. But instead, New Chicago was left in the dark. It was not told that it owed Lake Station a half million dollars for its proportionate share of Lake Station's agreed judgment until May 2005. New Chicago was then formally billed for its proportionate share of Lake Station's agreed judgment and interceptor costs on May 15, 2006. Appellant's App. p. 219 (Stipulation of Facts); *see also id.* at 219–20 ("[Lake Station] is not seeking prejudgment interest in this present case against [New Chicago] until the period commencing May 15, 2006 (the approximate date on which [Lake Station] billed [New Chicago] for [New Chicago's] proportionate share [of the agreed judgment]). The sum paid by [Lake Station] to GSD included interest on the then outstanding balances at three (3) percent per annum from January 1, 1990, through July 15, 2005."). Requiring New Chicago to pay now for charges accumulated from 1990 to 2004 inevitably means that some of New Chicago's current sewage customers would be forced to pay for services that they did not receive. This is a situation that could have been

avoided if Lake Station would have simply informed New Chicago that GSD had increased the rates, thereby giving New Chicago a choice of how it wished to proceed. But instead, New Chicago was given a choice only after the agreed judgment in 2005: give Lake Station a half million dollars or else face its own lawsuit. This is too little, too late.

Contrary to Lake Station's argument on appeal, New Chicago's summary judgment motion does not rest on the assertions of its officials, who claim that they were "ignorant of all of the facts, because [Lake Station] never provided any written notice of those facts," thereby making summary judgment inappropriate in this case. Appellee's Br. p. 18. Rather, New Chicago's motion rests on the clear lack of notice from Lake Station itself. *See* Appellant's App. p. 218–20 (Stipulation of Facts providing that Lake Station did not bill New Chicago at the $1.20 GSD rate from January 1, 1990, through December 31, 2004, and that Lake Station did not bill New Chicago for its proportionate share of the judgment and the interceptor costs until May 15, 2006). Lake Station has pointed to no designated evidence in the record in which it notified New Chicago before 2005.

■ And although as a general matter government entities are not subject to equitable estoppel, in certain situations application of estoppel of government entities is appropriate. *Equicor Dev., Inc. v. Westfield–Washington Twp. Plan Comm'n,* 758 N.E.2d 34, 39 (Ind.2001). In *Equicor,* Equicor submitted documents to and appeared before the Westfield–Washington Township Plan Commission on several occasions for approval of its plat for development of 27.2 acres as a cluster housing development. *Id.* at 35. A subcommittee of the Subdivision Committee recommended that Equicor. add additional green space and make some minor changes to the streets, and Equicor undertook to do both. *Id.* at 36. The plat was returned to the full Subdivision Committee for final review. *Id.* The Plan Commission voted to deny approval of the plat. *Id.* The Commission members cited a failure to comply with a requirement that the applicant designate two "on-site" and one-half "off-site" parking spaces, excluding garages and carports, for each one to three bedroom unit. *Id.*

On appeal, our Supreme Court stated that estoppel may be appropriate against a government entity where the party asserting estoppel has detrimentally relied on the government entity's affirmative assertion or on its silence where there was a duty to speak. *Id.* at 39. The Court held that although the Plan Commission suggested other changes in the plat, "it was silent as to any parking issue." *Id.* In response to the suggestions that were made, Equicor added green space and made minor changes to the streets but made no changes in the apparently acceptable parking. The Court continued, "Equicor thus relied on the Plan Commission's silence by proceeding in the reasonable belief that the plat would be approved and failing to make changes in the easily correctable flaws in the parking designation." *Id.* "In sum, the Plan Commission had ample opportunity to point out any deficiency in the designation of parking, and Equicor reasonably relied on the absence of any parking issue in processing its proposal. Under these circumstances, the Commission was estopped from asserting this deficiency as the reason for its disapproval of Equicor's plat." *Id.* at 40.

■ The same can be said here, too. Lake Station had a duty to bill New Chicago at the GSD rate (and not at a rate which it thought it should pay). Because Lake Station remained silent from 1989 to 2005, New Chicago reasonably believed

that it was paying its proportionate share of the treatment charges at the proper GSD rate and the interceptor costs. Like the Plan Commission in *Equicor*, Lake Station had ample opportunity (fifteen years in fact) to notify New Chicago of the increased rate. Yet Lake Station remained silent. Application of estoppel against Lake Station, a government entity, is appropriate in this case. Lake Station is thus estopped from collecting New Chicago's proportionate share of the treatment charges and interceptor costs from 1990 to 2004. We therefore reverse the trial court and direct the court to enter summary judgment in favor of New Chicago on New Chicago's equitable estoppel defense. In light of this result, we do not need to address New Chicago's statute of limitations defense.

Reversed and remanded.[4]

MAY, J., and ROBB, J., concur.

4. As for New Chicago's argument that it is entitled to an order determining that it has the right to recover all attorney's fees and other professional fees and costs incurred in defending this claim, Appellant's Br. p. 30, we find that this issue was not decided by the trial court on summary judgment, Appellant's App. p. 10 (trial court's summary judgment order reserving other issues to be decided through the pending litigation). Therefore, we do not address it on appeal and order that it be addressed on remand.